1          IN THE UNITED STATES DISTRICT COURT

2                 DISTRICT OF ARIZONA

3

4   United States of America              MJ-20-4887-TUC-DTF

5   vs.

6   Rene Christopher Bracamonte,          September 9, 2020
                                                  10:45 a.m.
7        Defendant.                        Tucson, Arizona
    _____

8

9          OFFICIAL TRANSCRIPT OF PROCEEDINGS

10         DETENTION AND PRELIMINARY HEARING

11      BEFORE THE HONORABLE LYNNETTE C. KIMMINS
             UNITED STATES MAGISTRATE JUDGE

12

13               A P P E A R A N C E S

14  For the Government:

15      Nicole P. Savel
        United States Attorney's Office
16      405 West Congress
        Tucson, Arizona 85701

17

18  For the Defendant:

19      Jay V. Sagar
        Federal Public Defender's Office
20      407 West Congress
        Suite 501
21      Tucson, Arizona 85701

22

23          PROCEEDINGS WERE DIGITALLY RECORDED

24      TRANSCRIBED BY:  ERICA R. McQUILLEN, RDR, CRR
              405 West Congress, Suite 1500
25                 Tucson, Arizona 85701
                    (520) 205-4267

```
1                      EXAMINATION INDEX

2  WITNESS FOR THE UNITED STATES OF AMERICA:

3  MICHAEL RINALDI
        DIRECT BY MS. SAVEL . . . . . . . . . . . . . . .  7
4       CROSS BY MR. SAGAR . . . . . . . . . . . . . . .  63
        REDIRECT BY MS. SAVEL . . . . . . . . . . . . . .  94
5

6

7  WITNESS FOR THE DEFENSE:

8  JESUS PINA
        DIRECT BY MR. SAGAR . . . . . . . . . . . . . . . .99
9       CROSS BY MS. SAVEL . . . . . . . . . . . . . . . . 103
        REDIRECT BY MR. SAGAR . . . . . . . . . . . . . . .105
10      FURTHER CROSS BY MS. SAVEL . . . . . . . . . . . . 106

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT

```
 1                        EXHIBIT INDEX

 2    Exhibit Number                    Marked      Admitted

 3    1                                   26           26

 4    2                                   41           41

 5    3                                   41           41

 6    4                                   41           41

 7    5                                   41           41

 8    6                                   41           41

 9    7                                   41           41

10    8                                   41           41

11    9                                   41           41

12    10                                  41           41

13

14

15

16

17

18

19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT

1                    P R O C E E D I N G S

2              THE CLERK:  Calling case 20-MJ-4887, Rene

3    Christopher Bracamonte, on for detention and preliminary

4    hearings.

5              Counsel, please state your appearances for the

6    record.

7              MS. SAVEL:  Good morning, Your Honor.  Nicole Savel

8    appearing on behalf of the United States.

9              THE COURT:  Thank you.  Good morning, Ms. Savel.

10             MR. SAGAR:  Good morning, Your Honor.  Jay Sagar

11   representing Mr. Bracamonte, who is present, in custody.

12             THE COURT:  Thank you.  Good morning, Mr. Sagar.

13             Good morning, Mr. Bracamonte.

14             THE DEFENDANT:  Good morning, ma'am.

15             THE COURT:  This is the time set for the preliminary

16   hearing and dangerousness hearing.  Are the parties ready to

17   proceed?

18             MS. SAVEL:  Yes, Your Honor.

19             MR. SAGAR:  Yes, Your Honor.

20             THE COURT:  Okay.  Ms. Savel, if you'd like to

21   start.

22             MS. SAVEL:  Yes, Your Honor.

23             Before we proceed, I do have the Government's case

24   agent here, Michael Rinaldi.  I'm not sure, and I didn't get a

25   chance to ask defense counsel, if either potential witnesses

1   he had mentioned to me, Mary Sierra or Jesus Pina, are going

2   to be testifying today, but if they are, I would ask to invoke

3   the rule so that they not be here or present during the

4   agent's testimony.

5               THE COURT:  Okay.

6               MS. SAVEL:  Or each other's.

7               THE COURT:  Okay.  Mr. Sagar, do you have witnesses

8   that you do plan to call?

9               MR. SAGAR:  Yes.  I don't plan to call Mary Sierra

10   but it is possible that I would call Jesus Pina, and so he

11   could step outside after -- if the Court wants to swear her

12   ahead of time or after.

13               THE COURT:  Okay.  And Cindy, how do you -- do you

14   want to just wait until they get on the stand?  Would that be

15   easier to swear them?

16               THE CLERK:  It's up to you.  (Inaudible).

17               THE COURT:  Yeah, I think what we'll do is well have

18   Mr. -- we'll have each of the witnesses sworn in once they get

19   to the stand just to kind of socially distance.

20               So Mr. Pina?  Yes.  You've been -- it's been

21   indicated by Mr. Sagar that you are going to be a potential

22   witness in today's hearing.  That -- and the Government has

23   invoked a rule which allows any potential witnesses to be

24   excluded from the courtroom during other people's testimony.

25               So at this time, I will need to have you leave the

 1  courtroom.  There's two rooms right outside that you can sit

 2  at, or you can sit outside in the main area, and then

 3  Mr. Sagar or someone else from the court will come get you

 4  when it's time to testify.  All right?  Okay.  Thank you.

 5          Ms. Savel, does the Government have any other

 6  witnesses that they plan to call?

 7          MS. SAVEL:  No, Your Honor.

 8          THE COURT:  Okay.  Any other preliminary matters

 9  before we go forward?

10          MR. SAGAR:  No, Your Honor.

11          MS. SAVEL:  No, Your Honor.

12          THE COURT:  All right.  Ms. Savel, you can call your

13  first witness.

14          MS. SAVEL:  Thank you.  The Government calls Agent

15  Michael Rinaldi.

16          THE COURT:  And the parties can stay at the --

17  rather than using the podium, if you prefer just to stay at

18  the table, that's fine with me.

19          MS. SAVEL:  Okay.  Thank you.

20          THE COURT:  Okay.

21          THE CLERK:  Sir, if you would please raise your

22  right hand.

23              MICHAEL RINALDI, WITNESS, SWORN

24          THE CLERK:  Thank you, sir.  You may be seated, and

25  as you are, please speak directly into the microphone, and

 1  please state your full name for the record, spelling your last

 2  name.

 3          THE WITNESS:  Special Agent Michael Rinaldi,

 4  R-i-n-a-l-d-i.

 5          THE COURT:  And then, Agent Rinaldi, for purposes of

 6  testimony, I'm going to allow you to remove the mask just so

 7  it's easier to hear you for everyone.  All right?

 8          THE WITNESS:  Yes, Your Honor.

 9          THE COURT:  Thank you.

10          And Ms. Savel?

11          MS. SAVEL:  Thank you.

12          THE COURT:  Whenever you're ready.

13                     DIRECT EXAMINATION

14  BY MS. SAVEL:

15  Q.   Good morning, Agent Rinaldi.

16  A.   Good morning.

17  Q.   Could you please tell the Court where you work.

18  A.   I work at the United States Secret Service Tucson

19  resident office.

20  Q.   How long have you worked with the Secret Service?

21  A.   11 years.

22  Q.   What's your current position?

23  A.   Special agent.

24  Q.   What are some of your duties and responsibilities as a

25  special agent?

1   A.   Conducting criminal investigations, conducting protective

2   intelligence investigations regarding threats to Secret

3   Service protectees, and protection of the Secret Service

4   protectees, the president and successors to the presidency.

5   Q.   And when you say "protectees," you're referring to the

6   president, successors to the president, any other, just

7   generally, types of protectees?

8   A.   Foreign dignitaries as well, visiting foreign

9   dignitaries.

10  Q.   And prior to -- how long have you been a criminal

11  investigator, also known as a special agent?

12  A.   Two years and eight months.

13  Q.   Prior to that, what positions did you hold?

14  A.   I was with the U.S. Secret Service uniform division as a

15  member of the countersniper unit.

16  Q.   As a uniformed Secret Service, what are your duties

17  there?

18  A.   Mainly physical protection of Secret Service protectees

19  and protected facilities like the White House.

20  Q.   Did you perform just general type of patrol duties within

21  that area?

22  A.   Yes, ma'am.

23  Q.   As part of your duties, did you become involved in an

24  investigation about a possible threat Vice President Michael

25  Pence?

1    A.    Yes.

2    Q.    And was that on August 11th, 2020?

3    A.    Yes.

4    Q.    Where was the possible threat at?

5    A.    It was at the Westin La Paloma Hotel.

6    Q.    Is that a resort?

7    A.    Yes.

8    Q.    And where is that located?

9    A.    It's located on the north side of Tucson.  I'd have to

10   look for the exact address of it.  You want the address?

11   Q.    Just Tucson works.

12   A.    Yeah, Tucson.

13   Q.    Were you already at the La Paloma resort on August 11th,

14   when the report of the threats came?

15   A.    I was.

16   Q.    Why were you there?

17   A.    I was assigned as the protective intelligence agent for

18   the visit of Vice President Pence on that day, so I was

19   responsible for protective intelligence duties for the entire

20   visit, so I came in the motorcade.

21   Q.    So basically a coordinator of the visit for the vice

22   president?

23   A.    Yes, yes, as part of the advance team.

24   Q.    And so was the vice president at La Paloma resort on

25   August 11th?

1   A.    He was.

2   Q.    Why was he there?

3   A.    He was giving remarks in the ballroom.

4   Q.    To an audience?

5   A.    Yes.

6   Q.    And where was the threat reported from that you

7   investigated?

8   A.    It was on the entrance drive near Via Palomita as you're

9   entering onto the La Paloma -- on La Paloma property.

10  Q.    Could you describe just briefly how that was set up

11  generally from a protectee or security standpoint with the

12  entrance drive?

13  A.    Yes.  There's a lower parking lot area where we had

14  military Explosive Ordnance Disposal technicians stationed so

15  that they could screen vehicles prior to coming up the drive.

16  In addition there is a Secret Service agent stationed there at

17  a -- we call it an outermost vehicle checkpoint.  He's

18  responsible for screening vehicles and the occupants of

19  vehicles prior to allowing them access.

20  Q.    Were public vehicles allowed access into the driveway up

21  toward the resort?

22  A.    No.  No.  There was certain exceptions for, like, special

23  needs that we would allow up the drive, but we weren't

24  allowing people to park up there.

25  Q.    And generally, what was the -- why was there a report or

1  was there assistance requested?

2  A.   Yes.  At approximately 11:15, there was a call for

3  assistance over the radio that there was a man that had

4  brandished a weapon close to the outermost vehicle checkpoint.

5  Q.   When you said "11:15," was that in the morning?

6  A.   Yes.

7  Q.   Did you then assist with investigation about this gun

8  waving by a male subject?

9  A.   Yes, I did.

10 Q.   To back up a little bit, the driveway, did that lead

11 directly to the front resort entrance where guests and

12 visitors would go into the lobby and check in or go elsewhere

13 in the resort?

14 A.   Yes, it did.

15 Q.   And could guests and visitors -- did they have free

16 access even during the vice president's visit?

17 A.   Of the rest of the hotel, yes.  Guests were allowed in

18 the rest of the hotel.

19 Q.   And they could drive in the driveway and walk into the

20 lobby?

21 A.   They were directed -- there is, like, a center pedestrian

22 path that they could walk down into -- it drops down into the

23 parking lot.  The parking lot is, like, below grade of where

24 the hotel is at.

25 Q.   You mentioned that there were ordnance disposal personnel

1    from the Army.  Were there other law enforcement agencies

2    there?

3    A.   Yes.  We had the Pima County Sheriff's Department

4    assisting as well with some security posts.

5    Q.   Who reported the threat or the gun brandishing initially?

6    A.   Initially it was a Secret Service special agent assigned

7    to the outermost vehicle checkpoint.

8    Q.   With a call for assistance?

9    A.   Yes, yes.

10   Q.   And did you learn who the witnesses were that had

11   reported the incident?

12   A.   I did.

13   Q.   And who were they?

14   A.   They were our -- three of our Explosive Ordnance Disposal

15   members, Louis Stergar, Tristan Tanzini, and Joshua Wilson.

16   Q.   Were they all stationed at that area near the outermost

17   vehicle checkpoint?

18   A.   Yes.

19   Q.   What was their role in that area?

20   A.   They were assisting with the screening of vehicles for

21   explosives or dangerous substances.

22   Q.   And they're armed personnel; correct?

23   A.   Yes, they are.

24   Q.   Were they dressed like law enforcement that day?  Did

25   they have a uniform?

1    A.    No, they were not in uniform.

2    Q.    What were they dressed like?

3    A.    Typically they're dressed in, like, khakis and collared

4    shirts, polo shirts, or button-up shirts.

5    Q.    Were they armed that day?

6    A.    No.

7    Q.    Who did they tell about what they witnessed?

8    A.    They told the Secret Service agent assigned to the

9    outermost vehicle checkpoint.

10   Q.    From your investigation and from what agents learned, did

11   the Secret Service agent stationed at that checkpoint see or

12   hear anything at that time or witness what the witnesses

13   reported?

14   A.    He did not.

15   Q.    Do you recall who that Secret Service agent was?

16   A.    Yes, it was Special Agent William Rayle.

17   Q.    And Agent Rayle, did you learn why the agent didn't see

18   or hear anything regarding a threat?

19   A.    I did.  He was performing his duties, checking a vehicle

20   for access, so he was faced the other way, speaking to the

21   driver of the vehicle.

22   Q.    Did the Secret Service quickly meet with the three

23   witnesses to determine what happened and assess the initial

24   threat?

25   A.    Yes.

 1  Q.   And so you mentioned one of the EOD personnel was Tristan

 2  Tanzini.   What did he say that he observed?

 3  A.   Tristan Tanzini said that he observed a Hispanic male

 4  exiting the lower parking lot towards the drive.   He seemed

 5  agitated as he passed the EOD technicians.   He was making

 6  derogatory comments towards law enforcement.   He then made a

 7  threatening statement toward the vice president and brandished

 8  what appeared to be a handgun from a black bag that he was

 9  wearing in front of his person.

10  Q.   You mentioned derogatory comments and a threat against

11  the vice president.   Do you specifically -- did you learn what

12  Tristan Tanzini said was stated?

13  A.   Yes, ma'am.   And may I refer to my notes to look at the

14  quote?

15  Q.   Yes.   Which report would it be that you're looking at?

16  A.   It's Exhibit 11.

17       MS. SAVEL:   Okay.   Your Honor, I went head and

18  just -- those are not in the notebook, but I'm going to go

19  ahead and give you the reports.   To the defense, those were

20  disclosed yesterday, so I marked them as 11 and 12.

21  BY MS. SAVEL:

22  Q.   Would it help you to refresh your recollection, then, to

23  look at Exhibit 11?

24  A.   Yes, ma'am, for the quote.

25  Q.   If you could go ahead and do that and let us know what

1   was reported as being said by the male subject.

2   A.   Yes, ma'am.

3              THE WITNESS:  And it's a direct quote, so I'll --

4   there is a racial slur.  I'll leave that out, if that's okay

5   with you, Your Honor.

6              THE COURT:  That's fine.

7   A.   Tristan Tanzini stated that the man said, "Fuck the VP.

8   I'll shoot that," N-word, "too."

9   Q.   And do you -- are you aware of what other derogatory

10  comments were said?  You mentioned that as the male subject

11  was walking, or is that the comment that you were referring

12  to?

13  A.   That's the comment that I'm referring to.

14  Q.   You mentioned that Tanzini said that he saw the male

15  subject brandish a -- what looked like a firearm.  Can you

16  explain a little bit in more detail what Tanzini said that he

17  saw as far as where that was pointed, where it came from, that

18  sort of thing?

19  A.   Yeah.  He stated that he initially brandished it from a

20  black long-strapped backpack/fanny pack bag that he was

21  wearing on his chest.  He initially drew the weapon out of the

22  bag and then further moved down the drive and again brandished

23  the weapon in the air.

24  Q.   And by "brandish," what did he do?

25  A.   Waved it around.

DIRECT EXAMINATION OF MICHAEL RINALDI

1  Q.   And did Tanzini describe the gun?

2  A.   He did.

3  Q.   What did Tanzini say?

4  A.   He said that it appeared to be a black handgun, possibly

5  a Glock model, but he wasn't sure what the model was, make.

6  Q.   And are you aware whether -- is Tanzini familiar with

7  firearms?

8  A.   I would assume he is, being active-duty Army, at least,

9  you know, in some way.

10  Q.   What did Tanzini say he did once the subject made the

11  threats and waved the firearm around?

12  A.   He said that he -- he had attempted to take cover behind

13  a vehicle, one of the vehicles that was close to the

14  checkpoint.

15  Q.   Did Tanzini see where the male subject went?

16  A.   He said further down, further down the drive.  He didn't

17  see exactly where he went because he was taking cover.

18  Q.   Did he see if the male subject got in a vehicle?

19  A.   It looked like the male subject was getting into a

20  gray -- what they described as a gray sedan or a Lyft vehicle.

21  Q.   And I apologize if you already said this.  Did Tristan

22  Tanzini say what the subject was wearing?

23  A.   Yes.  He was wearing a red t-shirt and bluish

24  multicolored shorts and the black bag that was across his

25  chest.

1  Q.   And then you mentioned the other EODs, Louis Stergar and

2  Joshua Wilson.  Were they also spoken to?

3  A.   Yes, they were.

4  Q.   And did they confirm the statement that the male subject

5  said, and these are his words, "Fuck the VP.  I'll shoot

6  that," just say N-word, "too?"

7  A.   Yes, they did.

8  Q.   And were there any other differences about what Stergar

9  and Wilson said?

10 A.   Yes, they -- they corroborated that they heard the

11 statement, but they only witnessed the second time that the

12 subject was waving the firearm in the air.

13 Q.   Did Louis Stergar mention if he had an idea of what the

14 firearm could be that was waved in the area by the male

15 subject?

16 A.   Yes, he did.  He thought it was either a Glock or

17 possibly a Smith & Wesson.

18 Q.   Did all three EOD personnel take cover or try to take

19 cover once they saw the firearm being waved?

20 A.   Yes.

21 Q.   Did they then report the -- what they'd witnessed to the

22 Secret Service agent you previously mentioned?

23 A.   Yes, they did.

24 Q.   Was that Agent Rayle?

25 A.   Yes, ma'am.

1   Q.   What did the Secret Service agent do at that point?

2   A.   At that point he communicated what -- well, he attempted

3   to see if he could see where the subject went, which he

4   couldn't, so he communicated what had happened over Secret

5   Service radio traffic.

6   Q.   At that point, if agents had believed that perhaps the

7   male subject had left the property, why or did they attempt to

8   follow the Lyft vehicle or anything to try to find the male

9   subject at that time?

10   A.   So the resources that were on property were for the vice

11   president's visit, so that Secret Service agent didn't have

12   the ability to leave his post.  It would be against his

13   protocol to leave his post.

14   Q.   When this was reported, was the vice president speaking

15   to the audience at that time in the report?

16   A.   Yes, he was.

17   Q.   In order to try to determine who the subject was, what

18   did agents do about the identity of the subject?

19   A.   Oh, they viewed -- spoke with hotel security and viewed

20   surveillance video of the areas that the hotel had.

21   Q.   Were they able to locate a person matching the

22   description with the red shirt and other descriptors in hotel

23   surveillance?

24   A.   Yes.

25   Q.   And the hotel surveillance that was viewed, did it show

DIRECT EXAMINATION OF MICHAEL RINALDI                    19

 1  the subject in different areas?

 2  A.   It did.

 3  Q.   What areas of the hotel?

 4  A.   It showed the subject in the valet area, in the hotel

 5  lobby area by the reception desk and some other areas of the

 6  immediate lobby, and then in the center lobby area there's a

 7  bar, and he was seen in that area as well.

 8  Q.   When was the subject seen in the bar area?

 9  A.   The night before, so August 10th.

10  Q.   Were you able to talk with employees and get some credit

11  card information to determine a name from the credit card that

12  was used to purchase items at the bar the night before?

13  A.   The subject made purchases about approximately 7:10 and

14  7:13 p.m. of an alcoholic beverage and I think a salad, I

15  believe.  When he made a food order, they have to give a name

16  for the food runner's ability to give them the food, so he

17  gave the name of Rene, and then from the swipe transaction, we

18  were able to obtain the credit card information and a name

19  associated with it.

20  Q.   And I'm sorry.  I heard that he ordered a salad and what

21  else?

22  A.   An alcoholic beverage, I believe.

23  Q.   Once you all had the name from the credit card, were you

24  able to obtain an Arizona driver's license or information and

25  a photo for the subject?

DIRECT EXAMINATION OF MICHAEL RINALDI                    20

```
 1  A.    Yes.

 2  Q.    And what's the name from the credit card?

 3  A.    Rene Bracamonte.

 4  Q.    Was there a middle name?

 5  A.    C., Christopher.

 6  Q.    Okay.  And did you compare or was -- or if it was another

 7  agent, let us know, but compare the video surveillance and the

 8  driver's license photo?

 9  A.    We did.

10  Q.    And did it appear to be the same person?

11  A.    It did.

12  Q.    Were you able to locate possible addresses for

13  Bracamonte?

14  A.    Yes, we were.

15  Q.    And were they all in Tucson?

16  A.    Yes.

17  Q.    Did you conduct surveillance and take other investigative

18  steps to try to find him and locate where he was living?

19  A.    Yes, we did.

20  Q.    And did you do physical surveillance and some phone

21  surveillance?

22  A.    Yes.

23  Q.    And based on that, did you determine the address where

24  the defendant lived?

25  A.    Yes.
```

1   Q.   And what was that address?

2   A.   6711 West Illinois Street, Tucson.

3   Q.   At times during the surveillance, did you observe the

4   defendant riding in a vehicle driven by his mother?

5   A.   Yes.

6   Q.   And when I say his mother, what's his mother's name?

7   A.   Mary Sierra.

8   Q.   And had you identified that from other databases, that

9   she was his mother?

10   A.   Yes.

11   Q.   And then the vehicle that the defendant was observed

12   riding in with his mother, was that a 2013 red Versa?

13   A.   Yes, it was.

14   Q.   Did you determine who that was registered to?

15   A.   Yes.

16   Q.   Who was it registered to?

17   A.   Francisco Pina.

18   Q.   Based on your investigation and later context, is Rene

19   Christopher Bracamonte here in the courtroom?

20   A.   Yes, he is.

21   Q.   Could you please point to him and describe what he's

22   wearing.

23   A.   He's wearing an orange jumpsuit.

24   Q.   And you're pointing over toward defense counsel table?

25   A.   Yes.

1          MS. SAVEL:  Your Honor, may the record reflect that

2  the witness has identified the defendant?

3          THE COURT:  Yes, it may.

4  BY MS. SAVEL:

5  Q.   To go back to the threat incident, did you also learn

6  that there was a 911 call made by a citizen during the

7  incident?

8  A.   Yes, we did.

9  Q.   Who called 911?  Do you recall her name?

10  A.   I do.  It was Jodie Gottlieb.

11  Q.   And was she with anyone when she made the call from

12  information that you viewed?

13  A.   Yes.  She was with her husband Jim.

14  Q.   Did you review notes about the call from the 911

15  operator?

16  A.   I did.

17  Q.   Have you -- has Secret Service obtained a recording of

18  the 911 call yet?

19  A.   No, we have not.

20  Q.   Have you requested it?

21  A.   Yes, we have.

22  Q.   And based on at least the notes from the 911 call, what

23  did the -- Ms. Gottlieb report?

24  A.   Based on the notes, it was a Hispanic male, approximately

25  28 years old, waving a gun in the air.

1    Q.   Did the notes indicate where the individual, the Hispanic

2    male, approximately 28 years, was at when waving the gun in

3    the air?

4    A.   Yes, it was at the Westin La Paloma.

5    Q.   Did the report state what the male subject was wearing?

6    A.   Yes.

7    Q.   What was that?

8    A.   A red shirt.

9    Q.   Also during your investigation, did the Secret Service

10   discover a Facebook page for the defendant?

11   A.   Yes, we did.

12   Q.   What was the name or what is the name on that Facebook

13   page?

14   A.   Rene AKA Naynaytv Bracamonte.

15   Q.   Was there a Facebook Live video discovered that appeared

16   to be filmed right before, before the threat to the vice

17   president was made?

18   A.   Yes, there was.

19   Q.   Can you tell us about the video, where it appears to be

20   filmed, what is being worn, who's in it, et cetera?

21   A.   Yes.  From the video, it appears to be filmed in the

22   valet area of the Westin La Paloma.  The subject in the video

23   appears to be Rene Bracamonte, and he's wearing a red t-shirt

24   with a blue face covering around his neck, so you can clearly

25   see his face, and he has a black satchel bag in front of his

 1   chest.

 2   Q.    And did the defendant say anything?

 3   A.    He did.

 4   Q.    What did he say?

 5   A.    He made derogatory statements towards law enforcement and

 6   the vice president.

 7   Q.    And do you have a direct quote from viewing the Facebook

 8   Live video?

 9   A.    I do.  And again, if I can refer to my notes, Exhibit 11,

10   for the Court.

11   Q.    Exhibit 11?  Yes.

12         THE WITNESS:  Again, there is derogatory language

13   and a racial slur, so I'll just say, "the N-word," if that's

14   okay, Your Honor.

15         THE COURT:  That's fine.

16   BY MS. SAVEL:

17   A.    "Supposedly that is the vice president here.  If I wanted

18   to, I could smoke the," N-word.  "Fuck the vice president.

19   Fuck the president.  Fuck the PD.  Fuck all of these,"

20   N-words.  "You feel me?"

21   Q.    And this Facebook Live video, was it on the Rene

22   Bracamonte Facebook page?

23   A.    Yes, it was.

24   Q.    And were there other videos and photos and things that

25   reflected that it's the defendant's Facebook page?

 1   A.   Yes.

 2   Q.   Do you know what time, at least from -- or when it was

 3   posted?  Is there some kind of time stamp on that video?

 4   A.   10:58 a.m.

 5   Q.   On the same day as the threats?

 6   A.   Yes.

 7   Q.   And where did it appear that the defendant was filming

 8   himself?

 9   A.    In the valet area of the Westin La Paloma, in front of

10   the entrance doors.

11          MS. SAVEL:  Your Honor, if it's okay I don't

12   approach, I'll just show the agent what's marked as Exhibit 1

13   from here.

14          THE COURT:  That's fine.

15   BY MS. SAVEL:

16   Q.   And do you recognize Exhibit 1, the CD that I'm holding

17   or disk?

18   A.   Yes.

19   Q.   And is this a -- a disk that contains the recording of

20   the Facebook Live video?

21   A.   Yes.

22   Q.   And is it an accurate depiction of what was viewed on the

23   Facebook Live video that you just described?

24   A.   Yes.

25          MS. SAVEL:  And Your Honor, I would move to admit

 1  the video for the record and -- should the Court want to view

 2  it.

 3              THE COURT:  Any objection?

 4              MR. SAGAR:  No, Your Honor.

 5              THE COURT:  Okay.

 6              MS. SAVEL:  I'm not going to play it at this time

 7  though.

 8              THE COURT:  Okay.  Exhibit 1 will be admitted.

 9              MS. SAVEL:  And this has been disclosed to the

10  defense.

11  BY MS. SAVEL:

12  Q.   Ultimately, does Secret Service obtain an arrest warrant

13  for the defendant for a violation of 18 U.S.C. 871, threats

14  against the president and successors to the president?

15  A.   Yes, we did.

16  Q.   Where was the defendant arrested at?

17  A.   At 6711 West Illinois Street, Tucson.

18  Q.   Did you also have a search warrant to serve on that

19  Illinois address at the time of the service of the arrest

20  warrant?

21  A.   Yes.

22  Q.   The residence itself, could you generally describe it and

23  any kind of approximate size of the lot?

24  A.   Yes.  It was a trailer, single-story trailer home, white

25  and brown.  There was a fairly large backyard with, like, a

 1  chain-link fence partially around it.

 2  Q.   And the -- you said a trailer home.  Is it on wheels

 3  or --

 4  A.   No, no.  It's stationary.

 5  Q.   And what -- what's the area in that neighborhood like, if

 6  you could just describe it in general?

 7  A.   I would say fairly rural.  Some of the homes are more

 8  spread out.  Some of them are kind of close together.

 9  Q.   Do you have an idea how big the lot is that the home is

10  on?

11  A.   I don't know the exact size of the lot.  The backyard --

12  the backyard was a decent size.  The front yard wasn't very

13  large.

14  Q.   So was this a neighborhood where houses are spread out,

15  not close together?

16  A.   No.  The houses were -- some of the houses were close

17  together.

18  Q.   Who lived in the residence with the defendant?

19  A.   His mother, Mary Sierra.

20  Q.   When was the defendant arrested?

21  A.   August 25th.

22  Q.   And did that arrest occur in the morning?

23  A.   In the morning.

24  Q.   About what time?

25  A.   Approximately 7:30 in the morning.

 1  Q.   So if you could just tell the Court briefly, how was the

 2  arrest warrant and the search warrant coordinated and

 3  executed?

 4  A.   Sure.  We had -- well, we had assistance from Homeland

 5  Security agents as well as uniformed Pima County Sheriff's

 6  deputies.  We had a Secret Service agent set up surveillance

 7  early in the morning just based on our previous physical

 8  surveillance of the home to see if we could get eyes on the

 9  Nissan Versa.

10       At the time that we set up surveillance, the Versa wasn't

11  there, so approximately just after 7 a.m. our agent witnessed

12  Mary Sierra exit the residence, get into a silver in color

13  Jeep SUV.  We conducted -- myself and the Pima County

14  Sheriff's deputy conducted a traffic stop on the SUV in order

15  to inform Mary Sierra that we had a search warrant for the

16  residence and give her the opportunity to admit us into the

17  residence so that we didn't have to damage the door in

18  conducting a dynamic entry.

19  Q.   And did you later learn why Mary Sierra wasn't driving

20  the red Versa that you had come to see during physical

21  surveillance?

22  A.   Yes.  Later we were aware that it was -- it was not

23  starting.  It was in the shop.

24  Q.   So the SUV that picked her up, was that, like, a ride

25  share?

1   A.   I believe it was a friend.

2   Q.   A friend.  Okay.

3        Did she agree to allow you entry to serve the search

4   warrant and the arrest warrant?

5   A.   Yes, she did.

6   Q.   Did you tell her there was an arrest warrant for her son,

7   the defendant?

8   A.   Yes, I did.

9   Q.   And did you ask her where the defendant was?

10  A.   I did.

11  Q.   What did she say?

12  A.   She said he was in the house.

13  Q.   Did -- was Mary Sierra asked if there were any guns in

14  the residence?

15  A.   Yes, she was.

16  Q.   What did she say?

17  A.   She said, "I don't know."

18  Q.   And did the defendant's mother say anything else to

19  agents about the purpose of your visit or why you were there

20  before you went into the residence?

21  A.   Yes.  Prior to entering the residence, I explained that I

22  was a Secret Service agent, that I had an arrest warrant for

23  her son, and that we were going to take him into custody.  She

24  said something to the effect of, I knew he would get in

25  trouble for this.  He's stupid.  I don't -- I can't recall the

1  exact quote, but it was something to the effect of that.

2  Q.   Did the defendant's mother go into the residence with

3  you?

4  A.   Yes, she did.

5  Q.   Did you ask her where the defendant's room was?

6  A.   Yes.

7  Q.   And did you go into the room?

8  A.   I did, yes.

9  Q.   What steps did you take to announce that sort of thing?

10 A.   I announced, "Police."  I announced -- well, I

11 encountered subject Rene Bracamonte in bed.  I announced,

12 "Police with an arrest warrant."  I asked him to get out of

13 bed.  He did sit up in bed, put on a pair of shorts because he

14 was in his underwear.  We allowed him to put on a pair of

15 shorts.  And then myself and Pima County Sheriff's deputy

16 escorted him out of the house.  I handcuffed him in the front

17 yard and placed him in the back seat of Special Agent Chapa's

18 Government-issued vehicle.

19 Q.   Was the defendant asleep when you went into his room?

20 A.   Yes, he was.

21 Q.   While -- and who executed the search warrant?

22 A.   Secret Service agents and Homeland Security

23 Investigations agents.

24 Q.   And while the search warrant was being executed, was the

25 defendant being interviewed in the vehicle?

1   A.   Yes, he was.

2   Q.   That was outside the residence?

3   A.   Yes.

4   Q.   Was the interview recorded?

5   A.   Yes, it was.

6   Q.   Was the defendant Mirandized or read his Miranda

7   warnings?

8   A.   Yes, he was.

9   Q.   Did he indicate he understood and agree to speak with

10  agents?

11  A.   Yes, he did.

12  Q.   And have you -- were you there for part of the interview

13  and then did you listen to the recording of the interview?

14  A.   Yes.  I was there for part of the interview and I

15  listened to the recording.

16  Q.   During the interview, did the defendant acknowledge that

17  he was at La Paloma when the threat was made?

18  A.   Yes, he did.

19  Q.   Did he acknowledge that he had pulled a gun out at the La

20  Paloma and made comments about the vice president being at the

21  resort?

22  A.   Yes, he did.

23  Q.   Did he acknowledge that he had spent the night before at

24  the resort?

25          MR. SAGAR:  Your Honor, I would just object to the

 1  form, that the question is being asked in a leading way.

 2          THE COURT:  Sustained.  If you want to ask some

 3  open-ended questions.

 4          MS. SAVEL:  Okay.

 5  BY MS. SAVEL:

 6  Q.   Did the defendant say what he had done the night before,

 7  on August 10th?

 8  A.   Yes, he did.  He that he was staying with a friend in the

 9  hotel, in a room on the first floor.  He refused to give us

10  his friend's full name, only the first name of David and the

11  last initial of T.

12  Q.   Did he say what he had done the night before at the

13  resort?

14  A.   He did.  He said that they were basically drinking and

15  hanging out.  He said they were with some strippers from TDs

16  in Phoenix.

17  Q.   Did you -- was he talked to about the Facebook Live

18  video?

19  A.   Yes, he was.

20  Q.   Did he admit to filming the video?

21  A.   Yes.

22  Q.   Did the defendant explain -- explain why he filmed the

23  video or what he meant by it?

24  A.   Yes.  He explained that he was upset that he -- well,

25  initially, he explained that he thought that there should be

1   better -- basically better security measures in effect and

2   that he wasn't screened for weapons and so it seemed like it

3   would be easy to harm the vice president.

4   Q.   Did he express any other thoughts about the security

5   outside in the driveway area?

6   A.   Yes.  He was upset of the fact that he had to walk to get

7   into his rideshare vehicle.  I believe that he said that we

8   were fucking dicks for making him walk.

9   Q.   Do you recall what he said or what he claimed he said

10  when he pulled the gun out or what he was generally talking

11  about?

12  A.   He was just talking about how he disliked law

13  enforcement, and he expressed that to us, and his dislike for

14  -- in the interview, his dislike for the current

15  administration.

16  Q.   Did -- or was the defendant talked to about generally

17  when he carries guns or firearms?

18  A.   He was.  He said he usually carries a firearm.

19  Q.   When talking about the incident, did a knife come up?

20  A.   Yes.  We were -- Special Agent Chapa was asking him about

21  the bag that he was wearing, and we had initially thought it

22  was, like, a water bottle from the photos.  He told us that it

23  was a large knife.

24  Q.   And just to go back, are you talking about that kind of

25  fanny pack thing --

1  A.   Yes.

2  Q.   -- across the defendant's chest?

3  A.   Yes.  The black bag that he was wearing on his chest.

4  Q.   And was there something sticking out of the -- that bag

5  that you observed in surveillance video and the Facebook Live

6  video?

7  A.   Yes, there was.

8  Q.   What did you think it was?

9  A.   It appeared to be a water bottle.  That's what we thought

10 it was.

11 Q.   But he told you that it was what?

12 A.   He told us that it was a knife.

13 Q.   And what was sticking out from the pack?

14 A.   It was the -- like the sheath and the handle of the

15 knife.

16 Q.   And did you observe that in the Facebook video once you

17 realized what he was talking about?

18 A.   Yes.

19 Q.   Where did he say he got the knife?

20 A.   He said that -- I believe he said that it was his

21 friend's that he was staying with, his friend David.

22 Q.   At the hotel?

23 A.   Yes, that his friend had left it behind or that he took

24 it.

25 Q.   What did defendant tell you about any kind of substance

1   or alcohol abuse?

2   A.   He told us that they were drinking and that there was --

3   I believe that there was cocaine as well.

4   Q.   The night before?

5   A.   Yes.

6   Q.   Did he talk to you about whether or not he has substance

7   abuse addictions or alcohol problems?

8   A.   He did.  He said that he drinks nearly every day and that

9   he smokes marijuana daily as well and uses cocaine.

10  Q.   Did he tell you if he's an alcoholic?

11  A.   He did.

12  Q.   What did he say?

13  A.   He said he was an alcoholic.

14  Q.   When he was interviewed at that point, did -- was he

15  asked if there were any drugs in the residence?

16  A.   Yes.

17  Q.   What did he say?

18  A.   He said that there was marijuana and cocaine.

19  Q.   Did he explain where it was?

20  A.   He did.

21  Q.   What did he say?

22  A.   He said that it was in a bag, black bag.

23  Q.   Did he say whether it was his drugs or someone else's?

24  A.   He said it was his.

25  Q.   Did he also or was he talked to about if he had any plans

1  to assassinate the vice president or the president, any of

2  your protectees that Secret Service guards?

3  A.   Yes, he was.

4  Q.   What did he say?

5  A.   He said, no, he did not have any -- any plans for that.

6  Q.   Did he get talked to about any kind of gang affiliation,

7  past or present?

8  A.   Yes.  We asked him about gang affiliation.

9  Q.   What did he say?

10 A.   He acknowledged previously being active with the Westside

11 Barrio Hollywood gang.  He denied currently being active, but

12 he said that -- something to the effect of every time TPD

13 stops him they have to take photos of tattoos and -- because

14 of his gang affiliation.  He said that TPD has a file on him

15 for being in a gang or gang active.

16 Q.   Did Agent Chapa talk to him at all about his Facebook

17 page and any kind of questions about any kind of hand signs or

18 gestures on the page?

19 A.   He did.

20 Q.   What was he asked -- what was the defendant asked about?

21 A.   He was asked about a hand gesture in a photo that him and

22 some associates are wearing with yellow shirts and making a

23 hand gesture.

24 Q.   What's the hand gesture generally?

25 A.   It's --

1          MR. SAGAR:  Your Honor, I'm going to just object

2    about questions related to gang affiliation as irrelevant to

3    the charge.

4          THE COURT:  Ms. Savel?

5          MS. SAVEL:  Your Honor, it is relevant to

6    dangerousness.  I believe we're conducting a combined hearing.

7          THE COURT:  I'll overrule it.

8    BY MS. SAVEL:

9    Q.   Yes, if you could proceed to describe the hand gesture or

10   sign that was discussed.

11   A.   It was something like this.

12   Q.   And for the record, are you holding kind of fingers in a

13   W?

14   A.   Yes, ma'am.

15   Q.   And what did the defendant say about that kind of

16   three-finger gesture or sign?

17   A.   That it was some type of gang sign.  I don't recall

18   exactly what the gang sign means.

19   Q.   Did he say what gang it's a sign for?

20   A.   The Westside Barrio gang.

21   Q.   Did he explain that he hadn't been involved in gang

22   activity for years?

23   A.   He did.

24   Q.   Did -- or was the defendant asked about a recent arrest

25   for DUI charges?

1   A.   Yes, he was.

2   Q.   Did the defendant acknowledge that he had recently been

3   arrested?

4   A.   Yes.

5   Q.   And based on your investigation, when was the DUI arrest?

6   A.   It was on August 2nd.

7   Q.   Of 2020?

8   A.   Yes.

9   Q.   Did you obtain reports about that incident?

10  A.   Yes, we did.

11  Q.   Did -- were you involved with transport and booking of

12  the defendant?

13  A.   Yes.

14  Q.   And approximately do you recall how long the recorded

15  interview was?

16  A.   It was -- it was about 39 minutes long, I believe.

17  Q.   So with transport and booking, was there anyone with you?

18  A.   Yes.  Special Agent Chapa was driving, and I was in the

19  back seat, and then we had a follow vehicle with another

20  special agent that was just in case we had a breakdown or a

21  car accident, for safety.

22  Q.   So was there conversation during transport and booking?

23  A.   Yes, there was.

24  Q.   Did the defendant during that talk anything about his

25  mental health history?

1  A.   He did.  During booking, he stated that he had seen a

2  professional and was diagnosed in his youth as bipolar, but he

3  denied -- he said that he didn't think he was bipolar.

4  Q.   Did he say if he took any medication for that diagnosis?

5  A.   He said that he was prescribed Risperdal, I believe, but

6  that he was not taking it.

7  Q.   And forgive me if I'm jumping back to the recorded

8  interview, but when you spoke with or when you or Agent Chapa

9  spoke with the defendant, either -- well, let me ask this a

10  better way.  Did you talk to the defendant about whether the

11  firearm that was used during the threat incident was in the

12  residence?

13  A.   Yes, we did.

14  Q.   When did you talk to him about that?

15  A.   During the recorded interview, when he was in the back

16  seat of Agent Chapa's vehicle.

17  Q.   Did the defendant tell you where the firearm was that he

18  used at La Paloma?

19  A.   Yes, he did.

20  Q.   What did he say?

21  A.   He said it was under his pillow.

22  Q.   On his bed?

23  A.   Yes, on his bed.

24  Q.   Was he sleeping on that pillow when you all went into the

25  room?

 1  A.   He was.

 2  Q.   Did you ask if there were other firearms in the

 3  residence?

 4  A.   Yes, we did.

 5  Q.   What did he tell you?

 6  A.   He said there was a rifle and another handgun in a bag in

 7  the residence.

 8  Q.   So the execution of the search warrant, were there photos

 9  taken of the execution of the search warrant?

10  A.   Yes.

11  Q.   And did you provide some of those to the Government for

12  the hearing today?

13  A.   Yes, we did.

14         MS. SAVEL:  And Your Honor, may I approach?

15         THE COURT:  Yes.

16  BY MS. SAVEL:

17  Q.   So I've handed you what's been marked as Exhibits --

18  Government's Exhibits 2 through 10.  What are those?

19  A.   These are photos that were taken of evidence that was

20  seized during the execution of the search warrant.  Yes.  All

21  of it.

22  Q.   Okay.  So I want to direct your attention to -- well,

23  first let me ask, do these accurately depict items that were

24  seized at the residence and photographed that day?

25  A.   I'm sorry.  Could you repeat that?

1   Q.   Do these photos accurately depict items seized at the

2   residence and the execution of the search warrant that day?

3   A.   Yes.

4   Q.   Are they all the photos that were taken?

5   A.   No.

6           MS. SAVEL:  Your Honor, the Government moves to

7   admit Exhibits 2 through 10.

8           THE COURT:  Any objection?

9           MR. SAGAR:  No objection.

10           THE COURT:  2 through 10 will be admitted.

11   BY MS. SAVEL:

12   Q.   So let's go ahead and look at Exhibit 2.  What is this a

13   photo of?

14   A.   It's a photo of a .40 caliber Smith & Wesson handgun and

15   a yellow bandana, what appears to be a brown phone case on the

16   subject's bed.

17   Q.   Do you know what the blue object is?

18   A.   I don't know what that is.  It appears maybe it's a vape

19   pen or something like that, but I don't know.

20   Q.   Where was this?  Was this photo taken of the items as

21   they appeared on the bed?

22   A.   Yes.

23   Q.   And this was on the defendant's bed?

24   A.   Yes, it was.

25   Q.   Were the items out in plain view when they were first

1   discovered by agents?

2   A.   The -- a portion of the, like, the back part of the slide

3   of the handgun was visible from underneath the defendant's

4   pillow.

5   Q.   And the rest was under the pillow?

6   A.   Yes.

7   Q.   Was the firearm made safe and examined as far as whether

8   or not it was loaded?

9   A.   Yes, it was.

10  Q.   Was it loaded?

11  A.   It was.

12  Q.   Can you tell the Court more about that?

13  A.   Yes.  The weapon was loaded with a round in the chamber.

14  Q.   Is there any kind of significance?  What does that mean

15  to have a round in the chamber?

16  A.   If there's a round in the chamber, all someone would have

17  to do is press the trigger and the weapon would fire, as

18  opposed to just having the magazine and the weapon without one

19  in the chamber, they'd have to manually work the action to

20  chamber a round.

21  Q.   And I should back up.  Have you been a firearms

22  instructor or have some training in that area?

23  A.   Yes, ma'am.  I'm currently a firearms instructor.

24  Q.   With the Secret Service?

25  A.   Yes.

1  Q.   And then there's that -- a yellow bandana there.  Is that

2  folded up and partially under the firearm?

3  A.   Yes.

4  Q.   Is this the firearm that the defendant said that he used

5  at La Paloma?

6  A.   Yes, it is.

7  Q.   I want to show you what's been marked as Exhibit 3.  What

8  does this show -- and admitted -- Exhibit 3?

9  A.   This shows the same firearm, the Smith & Wesson, out of

10 the holster with the magazine removed, ammunition removed from

11 it, and the slide locked to the rear.

12 Q.   And the one bullet that's separated from the other

13 bullets, did that -- is that the one that came out of the

14 chamber?

15 A.   I would assume that that's the one that came out of the

16 chamber, and that's why I took the photo in this manner.

17 Q.   Now, if you could please look at what's been admitted as

18 Exhibit 4.

19      What does this photo show?

20 A.   This is a photo of the kitchen table in the residence

21 with what appears to be drug paraphernalia on it.

22 Q.   If you could help us out, there's a lot of items on the

23 table.  Where is the drug paraphernalia?  I know you can't

24 circle it on the screen, but could you describe it?

25 A.   Yes.  There appears to be a bong in the center of the

 1   photo, towards the lower portion, like a glass bong, and above

 2   that there's a yellow and green what appears to be a pipe or a

 3   bong.

 4   Q.   Is there anything else that would be drug paraphernalia?

 5   A.   There's a glass stopper in the center of the photo above

 6   like a white card or white piece of paper that looks like it's

 7   part of the glass bong.

 8   Q.   Then there's -- there's -- I see a pair of scissors with

 9   a blue handle.  Do you know what's on top of that?

10   A.   Oh, that looks like a portion of a yellow bandana.

11   Q.   Okay.  And then -- and that is -- is that between the two

12   bongs, sort of?

13   A.   Yes.

14   Q.   And then there's another pair of scissors where you can

15   see the handles in full.  Is there something -- it's like a

16   black object.  Do you know what that is?

17   A.   It looks like a large lighter or plasma lighter maybe.

18   Q.   Can you read what it says on it?

19   A.   Looks like it says, "This thing rips."

20   Q.   And this was on the kitchen table?

21   A.   Yes, it was.

22   Q.   Or this is a picture of the kitchen table?

23   A.   Yes.

24   Q.   Can you describe the living area as far as kitchen or

25   dining, living room, how that was set up?

1  A.   As soon as you enter the front door, the kitchen is --

2  the kitchen area where this table is at is to the right, and

3  then directly in front there is, like, a kitchen counter with

4  a sink.  To the right of that there is a small hallway, there

5  is a bathroom on the left, and then the defendant's room was

6  to the right, the door to the right, first door on the right,

7  and at the very end of that hallway there is a spare bedroom.

8  Q.   And this area with the kitchen and -- is there a living

9  area, like a living room or family room?

10 A.   Yes, there is.  As soon as you enter the residence, you

11 would pass the living area on the right and left side.

12 Q.   Is it an open area or are there walls?  How big is it?

13 A.   No.  There is a center area that when you walk in is

14 open.

15 Q.   Is it very big?

16 A.   Not very big, no.

17 Q.   Okay.  Now, if we could just look at admitted Exhibit 5.

18 What does this show?

19 A.   This is a AR-style rifle with -- they appear to be Magpul

20 PMAGs and two drum magazines removed.

21 Q.   So did you call those PMAGs?

22 A.   Yes.  It's just like a model of Magpul magazine.

23 Q.   Are those the kinds of -- I don't know.  I can't tell if

24 they're green or gray or black, but --

25 A.   They're black.

1   Q.   Okay.  Black magazines?

2   A.   Yes.

3   Q.   And did those go with the rifle?

4   A.   Three of them do.  Three of them are -- accept 5.56

5   ammunition.  One of them is -- accepts 7.62.

6   Q.   Did you find any kind of weapon that goes with the 7.62

7   ammunition?

8   A.   No, we did not.

9   Q.   And then is this a drum?  What did you call this, the

10  silver?

11  A.   There's a drum magazine in the center, as two drums in

12  the center part would enter into the magazine while the weapon

13  -- they're actually clear, the drums are clear, are partially

14  clear, so you could see the ammunition inside.

15  Q.   So it had some ammunition --

16  A.   This one, if I recall correctly, did not have ammunition

17  in it.

18  Q.   Okay.

19  A.   But you would be able to see it if it had ammo.

20  Q.   I see.  And then the other magazines that are not the

21  drum magazines, did they have any ammunition in them?

22  A.   I believe that they -- that some of them were partially

23  loaded.

24  Q.   This rifle, is it a semiautomatic rifle?  What type of

25  firearm is it?

1   A.   It's a semiautomatic.

2   Q.   And what does that mean, to be semiautomatic?

3   A.   Meaning you would -- for every time you press the

4   trigger, the action of the weapon, this particular weapon's

5   like a gas blowback, so it would work the action and chamber

6   another round, so you just have to press the trigger,

7   continually press the trigger to fire.

8   Q.   Where was this weapon and ammunition found?

9   A.   This was found in a -- in a black rifle-style bag in the

10  spare bedroom.

11  Q.   And the spare bedroom, was that next to the defendant's

12  bedroom?

13  A.   Yes.

14  Q.   What can you tell us about the spare bedroom?  Did

15  someone sleep in there?  What was it like?

16  A.   It appears that it was being used as, like, extra storage

17  space for, like, sneakers and clothing.

18  Q.   Male clothing or --

19  A.   Yes, male clothing.

20  Q.   Did you, from your investigation, determine whose

21  clothing or things were in there?

22  A.   That it was Rene Bracamonte's.

23  Q.   Did he tell agents this was his firearm?

24  A.   Yes, he did.

25  Q.   And if you could look at admitted Exhibit 6.

1          What is this a photo of?

2    A.    This was a Springfield XD chambered .45 ACP handgun.

3    Q.    And what is the agent holding in his hand besides the

4    firearm?

5    A.    He's holding an at least partially loaded magazine.

6    Q.    Where was this found?

7    A.    This was found in a front pocket of the rifle bag that

8    the larger rifle was found in.

9    Q.    Did the defendant tell agents that this is also his

10   firearm?

11   A.    Yes, he did.

12   Q.    Now, I want to show you Exhibit 7, if you could look at

13   that, admitted.

14          What is this a photo of?

15   A.    This is a large knife, nine inch -- I think the blade's

16   around nine inches.

17   Q.    Is it pulled out of the sheath in the photo?

18   A.    Yes.

19   Q.    Was it in the sheath or out of the sheath when you all

20   found it?

21   A.    I believe it was in the sheath.

22   Q.    Where was this located?

23   A.    This was located on an ottoman in the living room.

24   Q.    Is this the knife the defendant told you that he had?

25   Did he tell you that this was the knife he had in his -- that

1   chest pack at La Paloma?

2   A.   Yes.

3   Q.   And I think you said it was an ottoman.  Was this in the

4   main part of the house?

5   A.   Yes.

6   Q.   Was it visible in plain view in the home?

7   A.   It was.  It was in the main living area to the right of

8   the front door.  The ottoman was fairly close to the door, I

9   believe.

10   Q.   If you could look at Exhibit -- admitted Exhibit 8.

11       What does this show?

12   A.   These are two partially loaded nine millimeter magazines.

13   Q.   Where were these found?

14   A.   These were found on the kitchen counter.

15   Q.   Were they -- were they visual as shown here, out in the

16   open, on the counter?

17   A.   Yes.  Well, I believe this photo was not taken on the

18   kitchen counter, but they were visible on the kitchen counter.

19   Q.   Is this photo -- looks like there's some ties or

20   something.  Is this for evidence?

21   A.   Yes.  The zip-ties are for securing the firearms once

22   they're made safe.

23   Q.   Did this -- did these magazines go with any firearms in

24   the residence or could they be used?

25   A.   No.  We didn't locate a nine millimeter weapon in the

 1    residence.

 2    Q.   Did the defendant tell agents what these magazines went

 3    to?

 4    A.   I don't recall if he -- I don't recall.

 5    Q.   Now if you could look at Exhibit 9, admitted.

 6         Could you tell us where this photo was taken and why?

 7    A.   This is a photo of one of the cell phones -- well, there

 8    were two cell phones found on the subject's bed.  This is a

 9    photo of the home screen on one of the phones and two text

10    messages from Mom that say that they're raiding the house now.

11    Q.   What's the time on the phone screen?

12    A.   The time is 8:02 a.m.

13    Q.   On August 25th?

14    A.   August 25th.

15    Q.   And do the text messages show that they were sent

16    approximately 39 minutes ago?

17    A.   Yes, they do.

18    Q.   At this point agents had not opened the phone pursuant to

19    a search warrant or anything; correct?

20    A.   Correct.  This is just like if you -- if you have an

21    iPhone and you move it or touch the screen, it shows you

22    messages.

23    Q.   So based on the timing of when agents -- when you went in

24    the house to execute the search warrant and arrest the

25    defendant, was this sent right before or approximately right

 1  before you would have entered the home?

 2  A.    Yes.

 3  Q.    And the defendant's mother, did -- she was allowed to

 4  keep her phone on her when you spoke with her; correct?

 5  A.    Correct.

 6  Q.    Now, if you could look at admitted Exhibit 10.

 7        What does this show?

 8  A.    This is two mason jars with what appears to be marijuana.

 9  some marijuana residue, and another bag that -- with a white

10  substance that appears to be cocaine and two -- one or two

11  scales and a -- what appears to be a bong on the kitchen

12  table.

13  Q.    So were these items placed on the table to photograph?

14  Is this -- I mean, what I'm trying to ask, is this where they

15  were found?

16  A.    No.  They were not found there.  They were placed there

17  for photographs.

18  Q.    Where was the cocaine or what is believed to be cocaine

19  based on -- would it be your training and experience?

20  A.    It appears to be cocaine, yes.

21              MR. SAGAR:  Objection.  Speculation, Your Honor.

22              THE COURT:  If you want to lay some foundation.

23  BY MS. SAVEL:

24  Q.    Let me ask this.  Did the defendant tell you that he had

25  cocaine in the home?

 1   A.   Yes.  Yes, he did.

 2   Q.   And where did he tell you the cocaine was?

 3   A.   In a bag located in -- I believe the living room is where

 4   the bag was located.

 5   Q.   What type of bag?

 6   A.   It was a Versace, like a Versace backpack.

 7   Q.   And do you have any kind of experience, general

 8   experience, dealing with illegal drugs and narcotics?

 9   A.   Yes, I do.

10   Q.   Can you tell us about that?

11   A.   Well, prior to being a special agent with the Secret

12   Service, during my time on uniform division, we conduct

13   street-level criminal investigations, just like -- we have the

14   same police powers as the D.C. Police, so during traffic stops

15   or arrests and detentions I've encountered narcotics on

16   subjects.

17   Q.   And did you receive any kind of general training about

18   narcotics?

19   A.   Yes, I did, at the Federal Law Enforcement Training

20   Center in Georgia.

21   Q.   And this baggie and also the other material you mentioned

22   that you believed to be marijuana, was that taken into

23   evidence?

24   A.   It was not taken into evidence by Secret Service.  It was

25   taken by Pima County.

1   Q.   Sheriff's office?

2   A.   Pima County Sheriff's Department, yes.

3   Q.   And was that arranged between the two agencies so that

4   they would take custody of it?

5   A.   Yes.

6   Q.   And why is that?

7   A.   We don't typically take narcotics in our criminal

8   investigations.  We just don't typically take them into

9   evidence, so it was easier for Pima County to do it.

10  Q.   And can and will these substances be submitted for

11  testing by analysts?

12  A.   Yes, they can be submitted for testing.

13  Q.   And so this white bag that you believe based on your

14  training and experience is cocaine, that was found in a

15  backpack?

16  A.   Yes.  It was in a -- in a Versace.  I believe it was a

17  Versace backpack.

18  Q.   Was it -- where was it located in the backpack?

19  A.   I don't recall the exact -- I didn't search the -- do the

20  actual search on the backpack.  I don't recall the exact

21  location of it inside the backpack.  There was another pouch

22  that was in the backpack, but I --

23  Q.   Was it in the backpack like this, do you know?  I mean,

24  in just the bag?

25  A.   Oh, in the bag, yes.  I don't believe that it was altered

1   or anything.

2   Q.   Was it in another container?

3   A.   I don't recall.

4   Q.   And then these, I'll call them jars, did -- based on your

5   training and experience, did that appear to be marijuana?

6   A.   It does, yeah, it did.

7   Q.   And can that also be sent to the lab if it was retained

8   in evidence?

9   A.   Yes.

10  Q.   Did the defendant tell you that he had marijuana in the

11  residence?

12  A.   Yes, he did.  He said -- I think he said there was some

13  weed and cocaine.

14  Q.   Do you recall where these were found?

15  A.   I believe those were in the bag as well.

16  Q.   And then what's the -- you mentioned I think marijuana

17  residue.  Is that the bag that would be to the left of the

18  jars?

19  A.   Yes.

20  Q.   Where was that residue or smaller amount of what's

21  believed to be marijuana found?

22  A.   I believe there was some on the table, but again, I

23  didn't -- I didn't locate that myself, where other agents were

24  searching.

25  Q.   What about the scale or scales that's to the right of the

 1   jars?  Do you know where those were found?

 2   A.   I believe they were on the table, but I'm not 100 percent

 3   sure, either on the table or in the bag.

 4   Q.   Were there any other types of packaging or baggies found?

 5   A.   There were smaller Ziplock-style baggies found inside a

 6   black pouch that was inside the Versace bag.  There was a --

 7   like a small plastic container, about this size.  Then there

 8   was some more baggies found as well as some additional

 9   personal property that we located during inventory of the

10   evidence, so at our office.

11   Q.   Oh, what other personal property?

12   A.   There was some cash.  I believe it was $60 in cash that

13   we returned.

14   Q.   To?

15   A.   To Mary Sierra.

16   Q.   Okay.  And the little baggies, about how big were those?

17   A.   Oh, maybe this big.

18   Q.   Are you -- so for the record, maybe an inch by an inch

19   or --

20   A.   About.  About that size.  They were fairly -- they were

21   small.

22   Q.   And based on your training and experience with those in

23   relation to the cocaine, do you believe that that would be for

24   personal use?

25   A.   No.  I would think with the baggies and the scales that

 1  it could be used -- the scales could be used to measure and

 2  then the baggies to package a product with the cocaine or

 3  marijuana.

 4  Q.   How much did the marijuana weigh?

 5  A.   I don't remember the exact -- exact weight of the -- the

 6  marijuana.

 7  Q.   Would it be in your report anywhere?

 8  A.   Because we didn't -- didn't take it, I don't know if it's

 9  in -- because it is inventoried with Pima County.  I can look.

10  Q.   Okay.

11  A.   The evidence that's in the report is what was seized or

12  what's being held by Secret Service.

13  Q.   Do you think it's --

14       MR. SAGAR:  Your Honor, I'm going to object about

15  any -- I'm not sure exactly if the question's going this way,

16  but any further questions related to his opinion about whether

17  the drugs found were personal use or not unless he has current

18  drug trafficking law enforcement experience.

19       THE COURT:  Ms. Savel?

20       MS. SAVEL:  Your Honor, I don't have any other

21  questions asking his opinion.  I'm just trying to find out the

22  weights of the items.

23       THE COURT:  Okay.

24  BY MS. SAVEL:

25  A.   I know the cocaine was about 11 grams, a little over 11

1  grams.  I just don't remember how many grams of marijuana

2  there were.  I think it was over an ounce.

3  Q.    Okay.  Thank you.

4        So it would have been the Pima County Sheriff's Office

5  that would have weighed those?

6  A.    Yes.

7  Q.    Did you also talk to or agents talk to the defendant

8  about some body armor found in the residence?

9  A.    Yes, we did.

10  Q.    Can you tell us about that?

11  A.    During the booking process, I had asked him about body

12  armor found in the residence, and he said that he bought it

13  from someone at a party.

14  Q.    And can you explain to us what the body armor looks like

15  or what it's used for?

16  A.    It's like a blue in color soft body armor carrier as well

17  as soft body armor -- I guess you can call it, like, body

18  armor plating like law enforcement would wear or a security

19  guard would wear.

20  Q.    Where was that found?

21  A.    I don't recall the location of the body armor in the

22  residence.

23  Q.    Did you do some additional research on the defendant's

24  possible gang associations with the Hollywood Barrio gang or

25  Westside Hollywood Barrio?

1  A.   Yes, we did.

2  Q.   What did you do?

3  A.   I spoke with Sergeant Denzler with the Tucson Police

4  Department.  She was my counterpart during the vice

5  president's visit, so she's in intelligence.

6  Q.   She's in intelligence?

7  A.   Intelligence with TPD, yes.

8  Q.   And were you able to get any information that TPD had

9  about the defendant?

10 A.   She had told me that he was going to be entered into

11 GangNET based on prior contacts with the police.

12 Q.   Not based on your call?

13 A.   Not based on our investigation, no.

14 Q.   And as part of your investigation, did you learn what

15 colors law enforcement has come to associate with the

16 Hollywood Barrio gang?

17 A.   Yellow and blue.

18 Q.   Did you also observe the defendant's Facebook page during

19 the investigation and leading up to his arrest?

20 A.   Yes, I observed portions of it.

21 Q.   And did you observe anybody wearing yellow or making

22 signs on a Facebook page?

23 A.   Yes.  I -- there's a note on what I believe is like the

24 home page or the home photo of the subject and other

25 individuals wearing yellow and making some sort of hand sign.

1   Q.   Is it the hand sign you described before?

2   A.   Yes, yes.

3   Q.   And when you said "home page," is it like a profile

4   picture or just a -- or a post?  Do you know?

5   A.   I believe it was a profile picture.  It could have been a

6   post as well.

7   Q.   Did the defendant, I think I asked you this, but did he

8   acknowledge during the interview that he had gotten --

9   recently gotten a DUI offense?

10  A.   Yes, he did.

11  Q.   And I believe you testified that was on August 2nd of

12  2020?

13  A.   Yes.

14  Q.   Did you obtain a Tucson Police Department police report?

15  A.   Yes, we did.

16  Q.   And was the defendant cited for three different counts of

17  DUI?

18  A.   Yes.

19  Q.   Do you recall what those were?

20  A.   It was a DUI, and one of them was I believe an Arizona

21  state extreme DUI, so .15 to .2.

22  Q.   And from the report, what did you learn happened?  What

23  did the defendant do that brought himself to the police

24  department's attention?

25  A.   He was operating his -- a vehicle that was registered to

DIRECT EXAMINATION OF MICHAEL RINALDI                    60

 1   his mother, and he had crashed into a parked -- I believe it
 2   was, like, a parked pickup truck.
 3   Q.    In a neighborhood?
 4   A.    I think it was on, yeah, a side street, if I remember
 5   correctly.
 6   Q.    And did he total his mom's car?
 7   A.    Yes.  From the report it sounded -- it wasn't drivable,
 8   airbag deployment.
 9   Q.    Was there a breath test done at the time of arrest?
10   A.    I believe so.
11   Q.    And do you recall what it was?
12   A.    I believe it was .17, around there.
13   Q.    Did the defendant admit to drinking alcohol or using
14   other substances to the police department?
15   A.    Yes, he did.
16   Q.    What did he admit?
17   A.    He admitted to drinking alcohol and I believe using
18   marijuana.
19   Q.    Prior to the crash?
20   A.    Yes.
21   Q.    Is that case pending in Tucson City Court?
22   A.    Yes, it is.
23   Q.    Do you know if he has any pending court dates?
24   A.    I believe that there is a date in January, January 5th
25   maybe.

1  Q.   Of 2021?

2  A.   2021.

3  Q.   Do you know what type of hearing it is?

4  A.   I don't recall.

5  Q.   And then just generally, because you -- your agency acts

6  as -- for safety for your protectees, are there upcoming

7  visits by protectees to the District of Arizona?

8  A.   Yes.  There are several.

9  Q.   And could you give us a time frame?

10  A.   There's several throughout the rest of the month of

11  September and as well as others through -- at least through

12  the election, I would assume.  After that as well.  We

13  frequently have visits.

14  Q.   When you were talking with the defendant, did he talk to

15  you about any plans to relocate or move?

16  A.   Yeah, he said that he planned on traveling for vacation

17  purposes I believe to California and that he also had some

18  plans to relocate to Florida with his mother.

19  Q.   Did he make any comments about that in light of his

20  arrest?

21  A.   Oh, he said that that's probably not going to happen now

22  because he was in custody.

23          MS. SAVEL:  I don't have any other questions.

24          THE COURT:  Mr. Sagar, looking at the time, what I

25  would anticipate -- Cindy, can we get the courtroom back at

 1   1:30?  Can we get the courtroom back at 1:30?  I don't think

 2   anybody else has it.

 3          What I would anticipate doing at this point is just

 4   going ahead and taking a lunch break and coming back at 1:30.

 5          Is there any objection to that, Mr. Sagar?

 6          MR. SAGAR:  No, Your Honor.  That makes sense.

 7          THE COURT:  Okay.  Ms. Savel?

 8          MS. SAVEL:  No, Your Honor.  Thank you.

 9          THE COURT:  Okay.  So what we'll do is we'll just go

10   ahead and recess and come back at 1:30.

11          Ms. Savel, if I could have Exhibit Number 1, I can

12   look at that over the lunch recess --

13          MS. SAVEL:  All right.  And --

14          THE COURT:  -- since it's been admitted.

15          MS. SAVEL:  I apologize for interrupting.  I've put

16   the password because we have to encrypt our disks.

17          THE COURT:  That's fine.  That's fine.

18          And (indiscernible), you're excused until 1:30.

19   Thank you.

20          (Off the record from 12:00 p.m. to 1:40 p.m.)

21          THE CLERK:  We're back on the record with

22   MJ-20-4887, Rene Christopher Bracamonte.

23          THE COURT:  And Agent Rinaldi, you can come back on

24   the stand if you'd like.

25          And Mr. Sagar, are you ready for cross-examination?

1          MR. SAGAR:  Yes, Your Honor.

2          THE COURT:  Okay.  Go ahead.

3                    CROSS-EXAMINATION

4   BY MR. SAGAR:

5   Q.   Agent Rinaldi, you interviewed Mr. Bracamonte; correct?

6   A.   Yes.

7   Q.   And he told you that he still felt drunk from the night

8   before, when the alleged threat occurred?

9   A.   Yes, he did.

10  Q.   And that his purpose of going to the resort in the first

11  place was to drink and hang out with friends?

12  A.   Yes.

13  Q.   And I believe in your report you stated Bracamonte said

14  he arrived at the Westin La Paloma resort on August 10th,

15  2020, to meet with his friend David to drink beverages and to

16  hang out.

17  A.   Correct.

18  Q.   Surveillance video showed Mr. Bracamonte at the resort

19  the night before the alleged threat?

20  A.   Yes, sir.

21  Q.   And then you testified on direct about the credit card

22  transactions at the hotel lobby bar shortly after 7 p.m. on

23  August 10th?

24  A.   Yes, sir.

25  Q.   And those two purchases involved a salad and an alcoholic

1    drink?

2    A.   Yes, sir.

3    Q.   You spoke with the bar manager?

4    A.   Yes.

5    Q.   And she did not indicate to you that she or her employees

6    were afraid of Mr. Bracamonte; right?

7    A.   Correct.

8    Q.   The bar manager didn't say anything about employees

9    hearing any threats by Mr. Bracamonte?

10   A.   They did not.

11   Q.   And the footage does not show Mr. Bracamonte with any

12   guns?

13   A.   The bar footage of him at the bar?  Is that what you're

14   asking?

15   Q.   Yes.

16   A.   No, it does not.

17   Q.   Were the surveillance -- there's no surveillance footage

18   period where he's brandishing a gun?

19   A.   No, there's not.

20   Q.   And the footage doesn't show Mr. Bracamonte engaged in

21   any criminal conduct?

22   A.   No.

23   Q.   There's no evidence that any employee overheard

24   Bracamonte make threats or appear dangerous?

25   A.   Not at the -- not from the bar employees, no.

1  Q.   Okay.  Well, the hotel employees -- you spoke with other

2  hotel employees; right?

3  A.   I spoke with, yeah, well, other agents as well, talked to

4  valets, I believe, and I think there might be a statement from

5  a valet in the report, but I'd have to reference it.

6  Q.   You spoke with the valet.  You also spoke with the front

7  desk receptionist.

8  A.   Yes.

9  Q.   But none of them overheard Mr. Bracamonte make any

10  threats or appear dangerous?

11  A.   No threats, no.

12  Q.   And so the evidence showed that he was hanging out with

13  friends at the hotel and he ordered something from the lobby

14  bar?

15  A.   Yes.

16  Q.   So I just want to ask you a few questions about when he's

17  leaving the hotel.  The footage shows him on August 11th in

18  the morning, at about 11 a.m., leaving the valet area?

19  A.   Yes.

20  Q.   And then you spoke with the receptionist?

21  A.   Another agent initially spoke with her, yeah.  I spoke

22  with her as well though.

23  Q.   Okay.  So -- and when you spoke with her, she said that

24  Mr. Bracamonte had asked for a bottle of water and then left?

25  A.   Yes.

1  Q.   And he told the receptionist that he was suffering from a

2  hangover?

3  A.   He did, yeah.

4  Q.   And there's nothing -- well, we covered as far as her not

5  viewing him as dangerous.  She made no comments indicating

6  that she believed he was dangerous?

7  A.   She didn't.

8  Q.   And so Mr. Bracamonte simply got the water and then he

9  walked with a woman away from the resort?

10 A.   Yes.

11 Q.   And few questions about the Facebook Live video.  So

12 Agent -- is it Chapa or Chapa (different pronunciation)?

13 A.   Chapa.

14 Q.   Chapa.  Okay.  Agent Chapa reviewed surveillance footage

15 from August 11th at 10:58 a.m. showing Mr. Bracamonte holding

16 the cell phone at chest level?

17 A.   Yes.

18 Q.   And he's standing in front of the valet pickup/drop off

19 area?

20 A.   Correct.

21 Q.   And then he later reviewed the Facebook video that

22 Mr. Bracamonte had made?

23 A.   Yes.

24 Q.   And on that video, he states, "Supposedly that is the

25 vice president here."

```
 1   A.    Yes.

 2   Q.    It's either "here" or "there" --

 3   A.    Yeah.

 4   Q.    -- but, "Supposedly that is the vice president."

 5         So he doesn't state on the video that he knows even for

 6   sure that the vice president is there.

 7   A.    He doesn't.

 8   Q.    And then his comment is, "If I want to, I could smoke

 9   the," N-word?

10   A.    Yes.

11   Q.    So he didn't say in that video, I'm about to?

12   A.    No, he didn't.

13   Q.    He didn't say, I want to?

14   A.    No.

15   Q.    Didn't say, I'm going to?

16   A.    No.

17   Q.    And then his next comment is, "Fuck the vice president,

18   fuck the president, fuck the PD, fuck all these," N-words;

19   right?

20   A.    Yes.

21   Q.    And so this is a general rant against several different

22   people?

23   A.    Yes.

24   Q.    He's not making a specific threat against any of these

25   people?
```

1  A.   No.

2  Q.   And he doesn't pull a gun out on the video while making

3  these statements?

4  A.   No.

5  Q.   There is a female friend or perhaps girlfriend nearby?

6  A.   Yes.  She was in the valet area.  I don't believe she

7  went into the lobby.  I don't remember.

8  Q.   Okay.  But then, after making these statements on the

9  Facebook video, Mr. Bracamonte then walks away from the resort

10 with the female?

11 A.   Yes.

12 Q.   And he's walking towards his Lyft driver?

13 A.   He's walking towards the parking lot area.  There is,

14 like, a center pedestrian path that he's walking towards.

15 Q.   But you later learned that he ultimately got into a Lyft

16 car and left?

17 A.   Yes, yeah.

18 Q.   Okay.  So as far as the driveway entrance, I just want to

19 ask you a question about that.  Is this -- is it a private

20 driveway, or is it part of the resort property, where the

21 alleged threat --

22 A.   It's part of the resort property.  There is a separate

23 entrance to, like, private residences, I think, that goes to

24 the left as you're going up towards the hotel, but it's a

25 drive for the hotel resort area.

1  Q.   Okay.  But it's definitely not the main parking lot area

2  of the resort or the main area where people come to get -- to

3  pick up people?

4  A.   It leads to -- you mean where they would pick them up in

5  the front?

6  Q.   Yeah.  So there is the main -- outside of the valet or

7  outside of the front entrance of the hotel, there is a main

8  parking lot; right?

9  A.   Yes.

10 Q.   But where the alleged threat happened, when

11 Mr. Bracamonte's on the driveway, that's removed from that

12 main parking lot area?

13 A.   Yeah.  He came through the parking lot and then was

14 heading down the -- down the drive.

15 Q.   Okay.

16 A.   Away from the hotel, down the drive.

17 Q.   Away from the hotel.  And then I think -- believe you

18 testified that Secret Service was not allowing public access

19 by vehicles into the -- into this driveway?

20 A.   With some exceptions but yes, that's correct.

21 Q.   But Lyft cars, for example, could not enter that?

22 A.   Correct.

23 Q.   So the three officers, the Army personnel, they're

24 stationed at the checkpoint; right?

25 A.   Correct.

1  Q.   And I believe you testified on direct that Tanzini and

2  Stergar and the other Army personnel officer, that they heard

3  this threat by Mr. Bracamonte as he walked by the checkpoint?

4  A.   Correct.

5  Q.   And he stated, "Fuck the VP.  I'll shoot that," N-word,

6  "too?"

7  A.   Correct.

8  Q.   That's what they heard as he's walking by them at the

9  checkpoint?

10 A.   Yes.

11 Q.   Okay.  You reviewed the affidavit that was prepared by

12 Agent Chapa; right?

13 A.   I did, for the -- which are you referring to?

14 Q.   The affidavit, I'm sorry, in support of the search

15 warrant.

16 A.   The residential search warrant?

17 Q.   Yes.

18 A.   Yes.

19 Q.   And in the search warrant, Agent Chapa includes

20 information that was based on interviews that were conducted

21 with these Army personnel by an Agent Seat?

22 A.   Yes.  He does.

23 Q.   Okay.  And in that search warrant, do they state -- as

24 far -- well, the agent -- the officers, the Army personnel

25 officers, state that Mr. Bracamonte was 20 to 25 yards away

 1  from the officers when he made the comments?

 2  A.   I believe Tanzini said 20 to 25 yards, if that's correct.

 3          MR. SAGAR:  If you give me a moment, Your Honor, I

 4  think I might -- I have to get to the proper page here.

 5          THE COURT:  Sure.  Take your time.

 6  BY MR. SAGAR:

 7  Q.   This affidavit is marked as Exhibit 20.  It's at

 8  disclosure page 13, starting at page 13, but --

 9          MR. SAGAR:  I'd like to -- if I can approach the

10  witness, Your Honor?

11          THE COURT:  Sure.

12  BY MR. SAGAR:

13  Q.   So I'd like to provide you with Exhibit 20, and if you

14  can look at paragraphs 7, 8, and 9, and tell me the distance

15  that Mr. Bracamonte was from these officers when he allegedly

16  made these comments.

17  A.   7, 8, and 9?  20 to 25 yards.

18  Q.   And that's for all three of the officers; right?

19  A.   That's correct.

20  Q.   Do you know about how far the checkpoint is from the end

21  of that driveway?

22  A.   The end as in the exit of the hotel or where the entrance

23  of the hotel is at?

24  Q.   The exit of the driveway toward the private streets.

25  A.   I don't know that exact distance, no.

1  Q.   Okay.  But we do know that these statements were made

2  when these officers at the checkpoint were approximately 20 to

3  25 yards away?

4  A.   Yes.

5  Q.   And in the affidavit, as well as in your report, these

6  words are listed as being said, he said these things; right?

7  A.   That's how it's written, yes.

8  Q.   Okay.  Neither the affidavit nor your report states that

9  the words were yelled out?

10  A.   No.

11  Q.   And Mr. Bracamonte allegedly said, "I'll shoot that,"

12  N-word, "too."  Did he say anything else before that?

13  A.   According to the interviews of the EOD personnel, just

14  that he was agitated and upset with the police, but nothing --

15  there's no other direct quote.

16  Q.   Okay.  I'm just trying to get at why he would have said

17  "too," which sounds like he's saying also.

18  A.   I can't assume anything about that.

19  Q.   But he didn't reference shooting anyone else; right?

20  A.   Not that I know of.

21  Q.   And Mr. Bracamonte was not facing toward the officers

22  when he was saying these things?

23  A.   I believe initially he was, at least from Tanzini's

24  account, because he saw the weapon come out twice, was facing

25  towards him, but then he turned and walked further down prior

1  to waving it around over his head, I believe.

2  Q.   Okay.  So are you -- are you saying that he ended up

3  walking -- he walked further down and that he made more

4  comments when he went further down the driveway?

5  A.   I don't know about more comments or if the comments

6  were -- what he would have said prior to waving it over his

7  head.

8  Q.   Okay.  But they didn't -- they didn't state to agents

9  when they were being interviewed that he was facing directly

10 toward them and directing the comments toward them, is what I

11 mean.

12 A.   No, they didn't state that it was directly at them or

13 toward them.

14 Q.   And he first made the statements, and then he pulled out

15 the gun afterward; right?

16 A.   Correct.

17 Q.   So it's not that he's making these -- allegedly making

18 these statements at the time when he's waving a gun around?

19 A.   No.

20 Q.   Okay.  Well, in your report, you said, "...and then

21 pulled out a handgun from his pack after the" --

22 A.   Right.

23 Q.   -- "comment is made."

24      And then the officers had said that, when he walked

25 further down the driveway, they could only see a small portion

CROSS-EXAMINATION OF MICHAEL RINALDI                    74

1  of the vehicle, of the Lyft vehicle?

2  A.   That's correct.  The drive curves, takes a curve to the

3  left, if you're facing away from the hotel.

4  Q.   Do you know which part of the vehicle could they see, the

5  front or the back?

6  A.   I believe that they saw the rear of the vehicle.

7  Q.   And the objects obstructing the view of the car did not

8  obstruct the view of Mr. Bracamonte?

9  A.   I don't think so.

10  Q.   According to them, was he -- was he right near the

11  vehicle as he made these statements?

12  A.   Yes.

13  Q.   And then, according to the 911 caller, he was with a

14  female, and they were both close to a vehicle?

15  A.   Correct.

16  Q.   And he didn't point the gun at anyone; right?

17  A.   Not that I know of.

18  Q.   He pointed in the air?

19  A.   Correct.

20  Q.   He didn't shoot the gun?

21  A.   No.

22  Q.   And the -- these officers took cover, and then once

23  behind the vehicle, Bracamonte and the car were gone?

24  A.   Correct.

25  Q.   So it was only a matter of seconds that the gun was out?

1   A.   I don't know how long it was out.

2   Q.   Okay.  They didn't -- they weren't asked questions about

3   how long this period of time went on?

4   A.   I don't recall.  The whole encounter I don't think was

5   very long, so it wasn't very long that the weapon was out.

6   Q.   It could have been as little as a few seconds?

7   A.   It could have been, yes.

8   Q.   And then, to your knowledge, when he got in the Lyft

9   vehicle, he didn't return to the resort property?

10  A.   That's correct.

11  Q.   So to your knowledge, he was heading away from the event

12  where the vice president was?

13  A.   Correct.

14  Q.   And in your report, you stated that, after Mr. Bracamonte

15  made the alleged threat and brandished the gun, he and a

16  female then got into a Lyft vehicle and drove away?

17  A.   Correct.

18  Q.   So they got into the vehicle together and drove away?

19  A.   According to the witnesses, that's correct.

20  Q.   Okay.  And this was based on your interviews with the

21  witnesses as well?

22  A.   Yes.

23  Q.   And so when you interviewed Lieutenant Stergar, he

24  stated, "The man in a red shirt and his pregnant girlfriend

25  got in a Lyft and drove away?"

1   A.   Correct.

2   Q.   And then he described that vehicle as a gray Ford Focus?

3   A.   That's correct.

4   Q.   And your report does not mention that Stergar heard a

5   threat.

6   A.   I believe it says that Stergar heard -- they all heard

7   what Tanzini heard, and we interviewed Tanzini initially.

8   Q.   Okay.

9   A.   But only Tanzini saw the weapon twice.

10  Q.   Okay.  So Stergar and Wilson, they both -- was it Wilson?

11  A.   Yes.

12  Q.   Yeah, Stergar and Wilson both saw the vehicle -- I mean

13  the gun come out once?

14  A.   Once.

15  Q.   And we talked before about how Agent Seat had interviewed

16  the witnesses as well?

17  A.   He did.

18  Q.   And in his -- in the affidavit, Agent Chapa's affidavit,

19  it states that Lieutenant Stergar saw the female get into a

20  Lyft car, but the male did not get into the Lyft car at that

21  time.

22  A.   Correct.

23  Q.   And so according to Agent Seat's interview of Stergar,

24  the alleged threat was made after the female got into her

25  Lyft, and the male kept walking down the driveway?

1    A.    Correct.

2    Q.    And then, according to Agent Chapa's affidavit, it states

3    that Tanzini saw the female get into a Lyft car, but then the

4    male did not get into the Lyft car at that time?

5    A.    Correct.

6    Q.    Okay.  So -- okay.  So -- because what I'm trying to get

7    at here is, in your report, you had stated that they had

8    gotten in the vehicle together and driven away, and in these

9    other witness accounts, it states that the female got into a

10   Lyft car and then he got into a Lyft car.

11   A.    Right.  Yeah, we interviewed -- so Special Agent Seat

12   interviewed them initially.  I interviewed them briefly

13   because I was in charge of the intelligence for the whole

14   visit, so like I said, the vice president was on stage giving

15   remarks, so we had to make sure we were still on schedule with

16   getting in the motorcade and leaving.

17   Q.    I understand that --

18   A.    Go ahead.

19   Q.    But then you did note down -- the information that they

20   provided you is what you put in your report?

21   A.    Yeah, yes, correct.

22   Q.    Did the Army personnel officers draft reports?

23   A.    No.

24   Q.    Did Agent Seat draft a report?

25   A.    Yes.

 1  Q.   Okay.  And then you read through that report?

 2  A.   Yes.

 3  Q.   And you relied on that report and other interviews in

 4  preparation for your testimony?

 5  A.   Yes.

 6  Q.   So you approve of that report?

 7  A.   Of Special Agent Seat's report?

 8  Q.   Yes.

 9  A.   Yes.

10  Q.   You don't dispute the accuracy of it?

11  A.   No.

12  Q.   Okay.  And then you adopt that as part of the basis for

13  your testimony?

14  A.   Yes.

15            MR. SAGAR:  Your Honor, under Rule 26.2 -- I don't

16  believe I have Agent Seat's report.  Under Rule 26.2, if the

17  witness adopts or approves of another report that's been

18  drafted, then that report can then be disclosed to the party

19  requesting it.

20            THE COURT:  Ms. Savel, do you have a copy of

21  agent's -- is it Agent Seat?

22            MR. SAGAR:  Agent Seat.

23            THE COURT:  Do you have a copy of Agent Seat's

24  report?

25            MS. SAVEL:  No, Your Honor, but if I could ask the

 1   witness a couple of questions about that, my understanding is

 2   that his testimony would clear some of that up.

 3              THE COURT:  Okay.

 4              MS. SAVEL:  Or —— or I can tell the Court at least

 5   what my understanding is about.

 6              THE COURT:  Okay.  Why don't you tell me what your

 7   understanding is.

 8              MS. SAVEL:  My understanding is that the information

 9   that Agent Rinaldi put in this report he took from Agent

10   Seat's report and combined it with his report.  So my

11   understanding was that it was a full inclusion of Agent

12   Seat's report.  I could be mistaken, but Agent Rinaldi could

13   clear that up.

14              THE COURT:  Okay.  Based on that avowal, do you want

15   to ask some questions, Mr. Sagar?

16              MR. SAGAR:  Yeah, I'll ask a follow-up and then ——

17              THE COURT:  Okay.

18              MR. SAGAR:  —— I might want to make a comment about

19   that, as far as —— because the rule allows for a recess in

20   order to review the report and ——

21              THE COURT:  Is it adopting a report or just a

22   witness?

23              MR. SAGAR:  It's Rule 26.2.

24              THE COURT:  .2.  What subsection?

25              MR. SAGAR:  (F)(1).  So it states that, "A written

 1  statement that the witness makes and signs or otherwise adopts

 2  or approves then becomes subject to production for the party

 3  requesting it."

 4          THE COURT:  I guess the question becomes what does

 5  adopt or approve mean?

 6          MR. SAGAR:  Well --

 7          THE COURT:  Why don't you go ahead and ask him some

 8  questions and then you can make your argument further.

 9          MR. SAGAR:  Sure.

10  BY MR. SAGAR:

11  Q.   So Agent Rinaldi, you had testified that Agent Seat did

12  prepare a report, and so my question is, is that a standalone

13  report, or did you obtain information from him that you then

14  put into your report?

15  A.   He prepared an initial report the day of the visit as

16  part of his protective intelligence duties, and so if you --

17  Exhibit 11, on page 44, where it says, "The following is a

18  synopsis of SA Seat's interviews as provided to me," where

19  it's indented, that's --

20  Q.   Which page are you on?  I'm sorry.

21  A.   44.  It's the second -- if you're looking at the first

22  page of Exhibit 11, it's the second page.

23  Q.   Where it states that he conducted three field interviews?

24  A.   Yeah, second paragraph, that's correct.  So where it's

25  indented there is the report, where it says, "I, SA Seat, was

 1  assigned to the Westin," that's Wendell's, Special Agent

 2  Seat's, report.

 3          MR. SAGAR:  So Your Honor, I think what I would

 4  propose to do would be that I'll continue along with the

 5  hearing, and then I'll ask that Ms. Savel provide me the

 6  report following the hearing as soon as she's able to obtain

 7  it.

 8          If it has something that is different from what is

 9  contained in Agent Rinaldi's report, then I might ask to

10  reopen the hearing to question Agent Rinaldi regarding any

11  discrepancies that are there.  If it's substantially the same

12  and there's no further questions I would have, then that would

13  take care of the issue.

14          Just a brief argument on --

15          THE COURT:  Sure.  Go ahead.

16          MR. SAGAR:  -- adopt or approve, I've had this come

17  up before in other hearings, and once the agent has testified

18  that he's not disputing the accuracy of what's in the report,

19  and he wasn't personally there for these interviews that Agent

20  Seat conducted, the only basis for his testimony comes from

21  Agent Seat's report, and that's why you then are able to

22  obtain the report, because he's now adopted or approved.  Here

23  he testified both that he adopts it as a basis for his

24  testimony and he approves of it.  In other words, he doesn't

25  dispute the accuracy of it.

1           So I think on both of those reasons I am entitled to

2    the report.  The only question is whether it has any

3    discrepant fact that I would need to further question on.  So

4    I'd be fine with continuing on at this point instead of trying

5    to recess and setting a whole other date for it, if there may

6    not be anything that's different.

7           THE COURT:  Okay.

8           MR. SAGAR:  But if I'm provided with something, with

9    a report that has information that's relevant and different or

10   contradictory, then I would just ask to reopen the hearing at

11   that point.

12          THE COURT:  Okay.  Ms. Savel?

13          MS. SAVEL:  Your Honor, hearsay testimony is

14   admissible at a preliminary hearing.  That's what we're

15   presenting.  The agent has indicated that he put Agent

16   Seat's report within his report.  He even indented it.  And I

17   realize that he indicates that he adopts or -- I don't even

18   know if he was -- I don't recall if he was asked if he

19   approves it or if he understood what that means, but the agent

20   indicating that he adopts it I think is a different meaning

21   than what the purpose is here, which is the defense has been

22   provided with the information that Agent Seat provided and

23   that the agent has testified to.

24          I do not have that report.  I don't have an issue

25   getting it and providing it to the defense.  We did provide

 1   what I would consider extensive disclosure yesterday, as soon

 2   as we could get everything together to the defense, so we're

 3   certainly not withholding anything, but I think it's clear

 4   from what the agent has testified to on the report itself that

 5   it's clear that he's simply putting in his report what Agent

 6   Seat reported as opposed to adopting it as his own statement.

 7          He also interviewed these same witnesses and talked

 8   to them himself, as well as other agents, so I would submit

 9   that it's not really falling within the rule in the way that

10   the defense is arguing it, nor has there been a violation, but

11   I understand and can provide the report later.

12          THE COURT:  Okay.  And Agent Rinaldi, let me ask

13   you, the information that's indented on page 44 of Exhibit 11,

14   that information from Agent Seat, have you testified to any

15   other information from Agent Seat that would not be in that

16   indented material, as far as you know?

17          THE WITNESS:  No, Your Honor, not as far as I know.

18          THE COURT:  Okay.  So what I'm going to do, the way

19   I understand Agent Rinaldi's testimony is he's adopting or

20   approving the information from Agent Seat as Agent Rinaldi has

21   indicated in his own report, that's Exhibit 11, page 44, to be

22   the information that he's adopting and approving.  However, to

23   give the benefit to the defense, I will order that, Ms. Savel,

24   that the Government disclose to Mr. Sagar Agent Seat's report.

25          And Mr. Sagar, I'll give you leave to reopen only if

 1  there's information that you believe is relevant to the issue

 2  of dangerousness or the preliminary hearing.  There obviously

 3  may be some inconsistencies that Agent Rinaldi didn't adopt or

 4  put in his report that really aren't relevant to where we are

 5  here.  So if you believe, once you see the report, that

 6  there's discrepancies that warrant reopening, I'll give you

 7  leave to do that, but if there's just certain things that

 8  weren't added into his report but aren't relevant, I don't

 9  think it's important to waste everybody's time for that.

10          MR. SAGAR:  Yes, I understand, Your Honor.  And just

11  to clarify, I'm not in any way insinuating there is any kind

12  of a violation by the Government.  In fact, they did provide

13  me disclosure prior to the hearing.  It's simply that the rule

14  provides for this once, you know, the agent testifies and

15  adopts or approves.

16          So should I continue with questioning?

17          THE COURT:  Sure.  Go ahead.

18  BY MR. SAGAR:

19  Q.   In your report, Agent Rinaldi, you state that -- let me

20  make sure I get back to where I was, where I left off here.

21      Okay.  So we covered as far as -- where we left off was

22  having to do with the female getting into the car and driving

23  off together with Mr. Bracamonte versus the agents' -- the

24  officers telling Agent Seat that the female had first gotten

25  into a Lyft car and then Bracamonte did not get into the Lyft

1    car.

2    A.   Correct.

3    Q.   Okay.  And in interviewing with Mr. Bracamonte, he told

4    you that she actually used an Uber and he used a Lyft, so

5    there were two different cars?

6    A.   He did.  He told us that he got into a separate vehicle.

7    Q.   All right.  I want to ask you a few questions about the

8    guns that were found at the residence.  Mr. Bracamonte was

9    legally allowed to possess all of these firearms; right?

10   A.   Yes.

11   Q.   And no permit is needed in Arizona to carry a concealed

12   firearm?

13   A.   No.

14   Q.   So it wasn't -- it was not illegal for Mr. Bracamonte to

15   have a gun with him at the La Paloma resort?

16   A.   No.

17   Q.   And it was not illegal for Mr. Bracamonte to walk on the

18   road leading out of the resort with a concealed firearm?

19   A.   No.

20   Q.   The knife that was found at the residence, Mr. Bracamonte

21   was legally allowed to possess this knife?

22   A.   Yes.

23   Q.   And when -- were you part of the team that went into the

24   house when the search warrant -- when he was found in his

25   bedroom?

1   A.   I was.

2   Q.   Okay.  And so did you go into the -- were you the first

3   one to see him when you went into the bedroom?

4   A.   Yes, I was.

5   Q.   Okay.  And you didn't testify in any way that he resisted

6   arrest?

7   A.   He did not.

8   Q.   Or that he was aggressive towards you?

9   A.   He was not.

10   Q.   Or violent towards you?

11   A.   He was not.

12   Q.   And so despite having what you later found was the gun

13   under the pillow, he made no threatening action toward police

14   officers coming into his bedroom?

15   A.   He didn't, no.

16   Q.   And so you would characterize him as being cooperative

17   when he was arrested?

18   A.   Yes, he was cooperative.

19   Q.   I just want to make sure I have it clear as far as the --

20   the gang references that went on during direct.  Did you

21   testify that the -- when you spoke with TPD law enforcement,

22   that Mr. Bracamonte's not currently in a database for gangs

23   but he was going to be entered in?

24   A.   That's what I was told, yes.

25   Q.   And with the Facebook picture that's taken with the

 1  supposed gang signs, is Mr. Bracamonte in that Facebook

 2  picture making gang signs?

 3  A.   I believe he is.  I believe he's in the photo.  I don't

 4  recall if he's making the sign or not.

 5  Q.   Okay.  Just want to make sure, because you're testifying

 6  that you believe that.  You know that he was in the Facebook

 7  photo?

 8  A.   I would have to see the Facebook posting.

 9  Q.   Do you know the date of that, that that picture was

10  uploaded or when that picture even dates from?

11  A.   I don't know.

12  Q.   And there's -- there is a reference in your -- in your

13  report that he's affiliated with the Westside Barrio Hollywood

14  gang?

15  A.   Yes.

16  Q.   And so, I mean, "affiliated" can mean different things.

17  I think he might have even made statements that he previously

18  was affiliated?

19  A.   He did.

20  Q.   Besides the yellow bandana that's found in the house and

21  this picture that we don't know the date of it, what else?

22  There's no specific evidence that you can point to to show

23  that he is currently an active gang member?

24  A.   Outside of him telling us that he was affiliated with a

25  gang, no.

 1  Q.    Okay.  But didn't he -- didn't he tell you he was

 2  previously affiliated and he's not an active member now?

 3  A.    He did, yeah.

 4  Q.    And prior to his arrest, there was surveillance that was

 5  conducted on August 19th, August 20th, and August 21st?

 6  A.    Correct.

 7  Q.    And none of this surveillance while he's being followed

 8  shows him involved in any illegal conduct?

 9  A.    No.

10  Q.    What the agents saw was that he was with his mother?

11  A.    Correct.

12  Q.    And that he went to his grandmother's residence at least

13  on August 19th and August 21st?

14  A.    Correct.

15  Q.    And you conducted an interview of his mother, Mary

16  Sierra?

17  A.    Agents did.  I did not conduct that interview.

18  Q.    Okay.  But then you spoke with those agents and included

19  their information in your report?

20  A.    Yes, I did.

21  Q.    And what you learned is that Mr. Bracamonte is not

22  political?

23  A.    That's correct.

24  Q.    He has not shown an interest, any specific interest in

25  the vice president?

 1   A.    Correct.  Well, according to his mother's statements?  Is

 2   that what you're asking?

 3   Q.    Yes.

 4   A.    Yes, that's correct.

 5   Q.    And he hasn't attended any political events?

 6   A.    Correct.

 7   Q.    He talks a lot and says things he shouldn't?

 8   A.    Correct.

 9   Q.    He, quote/unquote, talks out of his ass?

10   A.    Yes.  I believe that's a quote.

11   Q.    And she also told you about him having a head injury a

12   couple years ago?

13   A.    Yes.

14   Q.    And it was a subdural hematoma?

15   A.    Correct.

16   Q.    And I believe there's a reference in there to him kind of

17   self-medicating or using marijuana and maybe other drugs

18   because of what he was dealing with related to that injury?

19   A.    Correct.

20   Q.    And I believe he told you that he smokes marijuana all

21   day every day?

22   A.    Correct.

23   Q.    And you're not currently working on a drug trafficking

24   task force; right?

25   A.    No, I'm not.

1    Q.    Okay.  And the scope of duty related to a Secret Service

2    agent does not include investigating drug trafficking crimes?

3    A.    That's correct, not typically.

4    Q.    Okay.  And so I know Mr. Bracamonte -- there was

5    marijuana that was found in his residence in those two jars;

6    right?

7    A.    Correct.

8    Q.    Okay.  But we know that he's a long-term habitual

9    marijuana smoker?

10   A.    Yes.

11   Q.    And you were involved with at least -- right at the very

12   beginning of cross we were talking about the interview that

13   you did with Mr. Bracamonte.  I want to ask you a few more

14   questions about that interview.

15         So his purpose was to drink and hang out at La Paloma?

16   A.    Correct.

17   Q.    And during the interview, he said words like, just to

18   kick back, he went to chill?

19   A.    Yes, that's correct.

20   Q.    To drink and chill by the pool?

21   A.    Correct.

22   Q.    And I believe during the -- it's not video, it's audio,

23   so I don't know for sure, and I just want to clarify with you,

24   the footage pictures show -- do the footage pictures show him

25   drinking by the bar and by the pool with friends?  Because it

 1  sounds like you're showing him pictures or video at that time.

 2  A.   No.  There was no photos at the pool, and there's no

 3  video surveillance by the pool area that we saw or that they

 4  had at La Paloma.

 5  Q.   Okay.

 6  A.   It was at the lobby bar.  I think what you're referring

 7  to is a photo of a friend that we referred to earlier, David,

 8  at the lobby bar inside.

 9  Q.   Okay.  And so from what you learned, it appears he stayed

10  overnight -- Mr. Bracamonte stayed overnight in a room with a

11  friend, and the friend had purchased that room?

12  A.   That's what he told us, yes.

13  Q.   And then the next morning he asked for the bottle of

14  water because he still felt drunk?

15  A.   Yes.

16  Q.   And when he walked down the road by the agent and the

17  military personnel, he was upset because they made him walk?

18  A.   Correct.

19  Q.   And this is in reference to the Lyft not being able to

20  enter the main parking lot because of the -- the additional

21  security, and so he needed to walk farther away to get to his

22  Lyft?

23  A.   That's correct.

24  Q.   And -- and Mr. Bracamonte was specifically asked whether

25  he had any interest in assassinations?

1  A.   He was.

2  Q.   And what he told you was that he was still drunk from the

3  night before when this incident happened, and he didn't say

4  anything about having any interest in assassinations?

5  A.   No, he denied having interest in assassinations.

6  Q.   And during the interview, recorded interview, he said he

7  was, quote/unquote, drunk as hell?

8  A.   I don't remember if that's the direct quote, but yeah, he

9  said he was still drunk.

10 Q.   And you put in your report that he expressed disdain

11 about the current administration?

12 A.   Correct.

13 Q.   And isn't it right that what he said he didn't like was

14 what -- what he characterized as what the president has said

15 about Mexicans?

16 A.   I believe so.  Maybe.  He did say he didn't like the

17 president.  There was a couple statements he made about that.

18 Q.   And he said he didn't like the president's racist

19 remarks?

20 A.   He may have said that, yeah.  I don't recall exactly

21 that, but yeah, he could have.

22 Q.   Okay.  But you remember him telling you about things that

23 -- some things that he didn't like about the president?

24 A.   Right, some things, yes.

25 Q.   But that was about as far as his political views went?

1  A.    That's correct.

2  Q.    And then in your report you note that nothing found

3  during the search warrant or subsequent interview indicated

4  any unusual interest in assassinations?

5  A.    That's correct.

6  Q.    So taking into account the interviews of his mother, of

7  him, the surveillance that was done, the video footage that

8  was reviewed, the results of the search warrant, there was no

9  evidence -- apart from the comment that was made as he's

10 walking away from the hotel, there's no evidence showing that

11 he had any specific interest in carrying out an assassination?

12 A.    No, not aside from making a threat and waving a firearm,

13 no, that's correct.

14 Q.    Okay.  It's what -- what the officers have characterized

15 as a threat, and that's the question that we're here to

16 determine, whether it's a threat or not, so I just don't want

17 to get into an opinion as to whether it's a threat.

18      So you didn't find -- there was no journal or manifesto

19 about seeking to harm the vice president?

20 A.    No.

21 Q.    So what we do know from the evidence is that

22 Mr. Bracamonte was drunk leaving the hotel, and he makes this

23 comment, and then he gets in a Lyft and leaves and allegedly

24 waves the firearm; right?

25 A.    No, I disagree with that.  I don't know that he was drunk

1   leaving the hotel.  He had stated that he needed a bottle of

2   water because he felt hungover or possibly still drunk, but I

3   can't say that for sure.  That's what he said.

4   Q.   Okay.  But you did speak with the receptionist who also

5   said that, when he went to get the bottle of water, that he

6   said he felt really hung over?

7   A.   He said that, yes, but I don't know if he was drunk.

8   Q.   Okay.  Do you know of any reason why he would make that

9   up to the receptionist before?

10  A.   I don't want to speculate.  I don't know.

11  Q.   Okay.

12            MR. SAGAR:  No further questions, Your Honor.

13            THE COURT:  Redirect, Ms. Savel?

14            MS. SAVEL:  Thank you.

15                        REDIRECT EXAMINATION

16  BY MS. SAVEL:

17  Q.   So just to clarify, the area where the defendant

18  threatened to shoot the vice president and waved the gun

19  around, did that have cameras pointing at it, surveillance?

20  Were you able to get any video of that?

21  A.   No, we could not.  There is no video of that area of the

22  hotel.

23  Q.   Are there cameras out there?

24  A.   No.

25  Q.   In the video surveillance that you observed of the --

REDIRECT EXAMINATION OF MICHAEL RINALDI

 1  where you did have it, with the hotel, the bar, the lobby, did

 2  you observe the defendant stumbling or anything in those

 3  videos?

 4  A.   No.

 5  Q.   And in the Facebook Live video, did he appear to be

 6  stumbling or slurring his words in that video?

 7  A.   No.

 8  Q.   When you interviewed him the morning of August 25th,

 9  would you -- would you describe his interview as coherent, or

10  did you have any issues in him understanding you?

11  A.   He was coherent and cooperative.

12  Q.   Did he answer questions appropriately?

13  A.   Yes.

14  Q.   And the Facebook video that was filmed, based on the

15  time, the filming occurred before he walked down the driveway

16  and made the threat?

17  A.   Correct.

18  Q.   On August 10th, was the vice president at La Paloma?

19  A.   No.

20  Q.   When was the vice president there, specifically a time

21  frame, on August 11th?

22  A.   It was -- I don't remember the arrival time.  We left

23  about 45 minutes after this incident took place, I believe,

24  because he was still on stage giving remarks during this

25  incident.

REDIRECT EXAMINATION OF MICHAEL RINALDI

1   Q.    In the surveillance footage of the defendant at the hotel

2   or the lobby bar, did he have the black chest pack on?

3   A.    No, he did not.

4   Q.    Did he have the chest pack on in the Facebook Live video?

5   A.    Yes.

6   Q.    Did he have the chest pack on during any of the other

7   surveillance that you were able to watch?

8   A.    Just in the lobby area asking for the bottle of water, I

9   believe, and then in the valet area, when he was walking

10  around valet area.

11  Q.    And the EOD officers that reported this, were they part

12  of stationed personnel in that protected area the Secret

13  Service had set up?

14  A.    Yes.  They were working as, like, a supplemental unit to

15  the Secret Service.  We use them at a lot of events.

16  Q.    In the area where the defendant waved the gun, were there

17  -- were there civilians or other people around?

18  A.    There was other EOD technicians, there was the Secret

19  Service special agent that was at the outermost vehicle post,

20  and then, well, we have the 911, the individuals that were

21  leaving the parking lot that called 911.  I don't know if

22  there were other -- I wasn't down there, so I don't know if

23  there were other civilians around in the parking lot area.

24  Q.    What is your understanding of the 911 call, where those

25  people were?

 1    A.    That the caller and her husband were departing the

 2    parking lot, so they were -- they were exiting the parking lot

 3    to go southbound down the drive and exit the resort complex.

 4    Q.    And the area where the defendant waved the gun, he was

 5    there, but could other resort guests and visitors walk freely

 6    in that area?

 7    A.    Yes.

 8    Q.    As far as the picture or profile picture of the defendant

 9    and others wearing yellow and making the hand signs, I want to

10    ask you about the Facebook Live video.  At the end of the

11    video, does it show the profile page of the defendant on

12    Facebook?

13    A.    I don't recall because of the way it was filmed from --

14    on a Government-issued phone.  I don't -- I'm not really sure

15    what you're asking.  You mean at the end of the video, does it

16    go back to his home page or --

17    Q.    Who filmed the Facebook video from the phone that it was

18    taken from?

19    A.    Special Agent Chapa.

20    Q.    Okay.  And then when he filmed that video, did he show

21    any of the profile page?

22    A.    Oh, yes, at the end of the video, I believe he does, yes.

23    Q.    So if someone were to look at the end of the video, they

24    would see that -- the picture you're referring to of the group

25    making signs and wearing yellow shirts?

1  A.   Correct.

2  Q.   The three EOD officers, did they provide contact

3  information?

4  A.   Yes, they did.

5  Q.   So to the best of your knowledge, they could be

6  subpoenaed for trial to testify about what they observed?

7  A.   Yes, they could.

8  Q.   You were asked some questions on cross-examination about

9  the defendant getting in a vehicle with a female or maybe not

10 getting in a vehicle.  Where did the belief come from that

11 perhaps they were together and got in the vehicle together?

12 A.   I think because they were both close to the Lyft vehicle,

13 and like I said, the drive curves down to the left, so it's

14 possible when they took cover that they either thought that

15 they saw him get in the vehicle or...

16 Q.   When you went in the residence to arrest the defendant,

17 did you have to wake him up to arrest him?

18 A.   Announcing "Police" and going in the room, he woke up,

19 yes.

20 Q.   And had Secret -- the Secret Service agent at that

21 checkpoint seen the defendant waving the gun, what would --

22 what are you all trained to do in that situation?

23 A.   I believe if the Secret Service agent witnessed a firearm

24 brandished he would have drawn his firearm and ordered him to

25 drop the weapon, and depending on whatever, you know, motions

1  he was making with the firearm, he could have been shot.

2        MS. SAVEL:  I don't have any other questions.

3        THE COURT:  Mr. Sagar, anything further?

4        MR. SAGAR:  No, Your Honor.

5        THE COURT:  Okay.  Agent Rinaldi, before you step

6  down, do you mind just grabbing some of the Clorox wipes and

7  wiping the microphone and the area just for the next witness?

8        THE WITNESS:  Yes, Your Honor.

9        THE COURT:  Thank you.  I appreciate it.

10        And Ms. Savel, do you have any other witnesses?

11        MS. SAVEL:  No, Your Honor.

12        THE COURT:  Okay.  So Mr. Sagar?

13        MR. SAGAR:  Yes, Your Honor.  I was going to call --

14  I am going to call Jesus Pina.

15        THE COURT:  Okay.

16        Thank you.  I appreciate it.

17        THE CLERK:  Please raise your right hand.

18              JESUS PINA, WITNESS, SWORN

19        THE CLERK:  Thank you, sir.  You may be seated, and

20  as you are, please speak directly into the microphone and

21  state your name for the record.  Please spell your last name.

22        THE WITNESS:  Jesus Pina, P-i-n-a.

23        THE COURT:  Mr. Sagar, go ahead.

24                    DIRECT EXAMINATION

25  BY MR. SAGAR:

DIRECT EXAMINATION OF JESUS PINA

1   Q.   Mr. Pina, do you know Rene Bracamonte?

2   A.   Yes, I do.

3   Q.   And how long have you known him?

4   A.   Since he was a baby.

5   Q.   And how is it that you know him?

6   A.   Through his father.  I've known his father for many

7   years.  And Mary, the mother.

8   Q.   Okay -- sorry.  Go ahead.

9   A.   What was that?

10   Q.   I didn't -- I was interrupting you.  I didn't hear the

11   last part of what you said.

12   A.   I known him for years through his father and Mary, and I

13   seen him since he was a baby.

14   Q.   So were you friends with his father then?

15   A.   Yes, I was.

16   Q.   And were you living with Mr. Bracamonte prior to him

17   being arrested?

18   A.   Yes, I was.

19   Q.   And how long had you been living with him before he was

20   arrested?

21   A.   Well, about -- well, about a year.

22   Q.   During that period of time, or even before then, when you

23   knew him, did you ever hear Mr. Bracamonte making political

24   comments?

25   A.   No.

DIRECT EXAMINATION OF JESUS PINA                    101

```
 1   Q.   Is he what you would consider a political guy, very
 2   interested in politics?
 3   A.   No.  I never -- he never spoke about political.  Either
 4   do I.
 5   Q.   Have you ever heard Mr. Bracamonte making threats to
 6   anyone?
 7   A.   No.
 8   Q.   Would you say that he's someone who's prone to getting
 9   into fights with people?
10   A.   Not that I know of.  I mean, he never spoke about
11   fighting.
12   Q.   And when you've been around him, have you seen him
13   fighting others?
14   A.   No.
15   Q.   Do you know him as being a violent person in any way
16   toward others?
17   A.   I don't know him as a violent person.
18   Q.   And before August 11th, let's say the period of 30 days
19   leading up to August 11th, did you hear Mr. Bracamonte making
20   any kind of political statements?
21   A.   No, not at all.
22   Q.   And you see him pretty frequently because you both live
23   together; is that right?
24   A.   Yeah.
25   Q.   Did Mr. Bracamonte say anything in that period of time
```

 1    leading up to August 11th that would indicate that he even

 2    knew the vice president was going to be in Tucson?

 3    A.    No.

 4    Q.    Did you know that Mr. Bracamonte was going to La Paloma

 5    on August 10th?

 6    A.    Yes, I did.

 7    Q.    And how was it that you knew that?

 8    A.    Because I was speaking to his mom when she was taking him

 9    up to the resort because I was out of town at the time, and we

10    were speaking over the phone when she told me she was taking

11    him up there to be with his friends.

12    Q.    And did she tell you what the purpose of the visit was

13    from what she learned from Mr. Bracamonte?

14    A.    The visit for him to go visit over there?

15    Q.    To go to La Paloma.

16    A.    To be with his friends.

17              MR. SAGAR:  Okay.  No further questions.  Well,

18    actually, I'm sorry, there was another question.

19              THE COURT:  Uh-huh.

20    BY MR. SAGAR:

21    Q.    Do you -- do you -- have you seen him with a yellow

22    bandana?

23    A.    Yellow bandana, no.

24    Q.    Okay.  Do you know of his cousin passing away a couple

25    months ago?

CROSS-EXAMINATION OF JESUS PINA

```
 1   A.    Yeah.

 2   Q.    Have you seen pictures of that funeral?

 3   A.    I saw pictures of it.

 4   Q.    Did you see people dressed in yellow?

 5   A.    Yes, I did.

 6   Q.    Do you know if at the funeral they gave out any kind of

 7   clothing items?

 8   A.    I don't know because I didn't go there.  I just saw

 9   pictures.

10   Q.    Okay.

11             MR. SAGAR:  No further questions.

12             THE COURT:  Okay.  Thank you.  Ms. Savel?

13                         CROSS-EXAMINATION

14   BY MS. SAVEL:

15   Q.    Mr. Pina, what is your relationship to the defendant's

16   mother?

17   A.    She's my girlfriend.

18   Q.    And you said that you've lived with the defendant and his

19   mom?

20   A.    For about a year.

21   Q.    And what address were you living at, which address, with

22   them?

23   A.    I don't know the address, but it was an apartment on

24   Valencia and Cardinal.

25   Q.    What about the Illinois Street address?
```

CROSS-EXAMINATION OF JESUS PINA

1   A.   Right now, the address now?

2   Q.   Yes.

3   A.   I don't know the address.

4   Q.   Do you live there with them too?

5   A.   Yeah, but I don't know the address.

6   Q.   Do you have an apartment off of Valencia still?

7   A.   No.

8           MS. SAVEL:  Could I have a moment, Your Honor?

9           THE COURT:  Sure.

10  BY MS. SAVEL:

11  Q.   So on August 25th, when the defendant was arrested, you

12  agree you weren't at the house when he was arrested; right?

13  A.   I wasn't there.  I was out of town at work.

14  Q.   I'm sorry.  What did you say?

15  A.   I was out of town at work.

16  Q.   And you had loaned your 2013 Versa to Mary after the

17  defendant totaled her car drunk driving; correct?

18  A.   Yes.  Yes, I did.

19  Q.   But on the day that the defendant was arrested, it was

20  with a mechanic?

21  A.   Yes, it was.

22  Q.   So how long had you been out of town on August 25th?

23  Like, how long?

24  A.   I think I'd been out of town for about two months.

25  Q.   Okay.  So you hadn't lived with them for two months prior

REDIRECT EXAMINATION OF JESUS PINA

1  to the defendant's arrest?

2  A.   Yeah.

3  Q.   And so you weren't in town when he got the DUI in August;

4  correct?

5  A.   I was in town but at my home in Phoenix when all that

6  happened.  That occurred on the weekend.

7  Q.   So you have a home in Phoenix too?

8  A.   Yes, I do.

9  Q.   And how old is Mr. Bracamonte?

10  A.   I think 30, 32, 31.

11          MS. SAVEL:  I don't have any other questions.

12          THE COURT:  Okay.  Any redirect, Mr. Sagar?

13                    REDIRECT EXAMINATION

14  BY MR. SAGAR:

15  Q.   Yeah, I just wanted to ask about the home in Phoenix.

16  Can you explain the purpose of the address in Phoenix?

17  A.   Explain it?

18  Q.   Well, when you go to Phoenix, who are you staying with?

19  A.   With my son.

20  Q.   Okay.

21  A.   My son and my ex-mother-in-law.

22  Q.   Okay.  And then -- and do you go there -- do you spend

23  the weekend there?  Do you spend all week there?

24  A.   I go the weekends there, sometimes the week.

25  Q.   Okay.  And -- and during the past year, apart from the

 1  time that you were out, you otherwise were living during the

 2  week, generally, with Mr. Bracamonte?

 3  A.   Yeah.

 4         MS. SAVEL:  Objection, leading.

 5  BY MR. SAGAR:

 6  A.   Yes.

 7  Q.   Okay.  Or if you can explain how it was that you were

 8  residing with Mr. Bracamonte.  Was it during the week?

 9  A.   It would be during the week, go four or five days.  Then

10  I'd go home on the weekends to be with my son.

11         MR. SAGAR:  No further questions, Your Honor.

12         THE COURT:  Anything else?  Ms. --

13         MS. SAVEL:  I just want to clarify.

14                  FURTHER CROSS-EXAMINATION

15  BY MS. SAVEL:

16  Q.   You had testified that you had not lived with Mary or the

17  defendant for two months prior to his arrest; correct?

18  A.   Because I was out of town.

19  Q.   Were you out of town the two months?

20  A.   Yeah.

21  Q.   So you weren't there during the week at that time; right?

22  A.   No, I wasn't.

23         MS. SAVEL:  Thank you.

24         THE COURT:  Thank you, Mr. Pina.

25         THE WITNESS:  Uh-huh.

 1              THE COURT:  Can I ask just one quick favor?  If you

 2    don't mind just taking the Clorox wipes and just wiping the

 3    microphone area and then just kind of the flat surface where

 4    you were, I appreciate it.  Thank you very much.

 5              Any other witnesses, Mr. Sagar?

 6              MR. SAGAR:  No, Your Honor.

 7              THE COURT:  Okay.  And Ms. Savel, any rebuttal?

 8              MS. SAVEL:  No.  Thank you.

 9              THE COURT:  What I'll do is I'll have -- let the

10    parties argue both for the preliminary hearing and the

11    dangerousness.  You can do it all at once if you like or

12    separately, whatever your preference is.

13              Do either one of you have a preference?

14              MS. SAVEL:  I don't.

15              MR. SAGAR:  I don't really have a preference either,

16    Your Honor.  I guess it would probably be easier to just do

17    all of the argument from one side and then all of the argument

18    on the other side.  I guess that's what -- it could be easier.

19              THE COURT:  And I'll give both sides rebuttal if

20    they feel that they need it.

21              MR. SAGAR:  Sure.

22              THE COURT:  Okay.  So Ms. Savel, why don't I let you

23    go first.

24              MS. SAVEL:  Should I remain here or go to the

25    podium?

1        THE COURT:  You can remain there.  That's fine.

2        MS. SAVEL:  Your Honor, the complaint charges the

3   defendant with one count of threats against the president and

4   successors to the presidency, in violation of 18 U.S.C.

5   871(a), and the elements of that charge are that the defendant

6   knowingly and willfully made a true threat to take the life

7   of, to kidnap, or to inflict bodily harm upon a victim; and

8   the victim was the President of the United States, the

9   president-elect, the vice president, or other officer next in

10  order of succession to the office of the President of the

11  United States or the vice president-elect.

12        Section 871 criminalizes knowingly and willfully

13  making any threat to take the life of or kidnap or inflict

14  bodily harm, in this case it would be against the vice

15  president.  The charged statement must be a true threat, which

16  has been defined for First Amendment purposes as, quote, a

17  serious expression of an intent to commit an act of unlawful

18  violence to a particular individual or group of individuals,

19  and I'm citing from Virginia v. Black, 538 U.S. 343.

20        And in looking at Elonis v. United States, 135 S.

21  Ct. 2001, which is in 2015, the Court established that,

22  through Elonis, that the Government is required to prove that

23  the communication would objectively be viewed by a reasonable

24  person as a true threat as well as subjectively that the

25  defendant acted with the knowledge that the communication

1  would be viewed as a threat.

2          But it is clear that the Government does not need to

3  prove that the defendant had the intent or ability to carry

4  out a true threat, and that's also in Black.  There's no

5  requirement in the elements of this offense that the defendant

6  intend to carry out the threat or even that he's capable of

7  carrying out the threat.  For example, had the vice president

8  not been there at the resort, that is a piece of evidence that

9  supports his intent in making the statement, in making the

10  threat, but the Government does not need to prove that he

11  intended to carry it out or even had the means to do so.

12          Now, in this case, the defendant actually did have

13  the means to do so, and he waved the firearm around in

14  conjunction with making the threat that he was going to shoot

15  the vice president, and regardless of whether or not he's

16  walking in the building, walking out, the fact that he made a

17  willful, knowing threat and waved a gun around in conjunction

18  with that is more than enough evidence that it's a true

19  threat.

20          And in this situation, in sort of blending the

21  probable cause finding with dangerousness, others took it as a

22  true threat as well.  The three EOD Army-trained personnel

23  took cover when he waved the gun around.  They didn't clearly

24  think it was a fake gun or didn't take him seriously or think,

25  oh, because he's headed out the door instead of in, that that

1    means that they shouldn't be afraid or fear for their safety

2    as well, and they immediately reported it to Secret Service.

3              This was in an area that was secured by Secret

4    Service.  It was clear to the defendant that they had that

5    secured for a reason.  In the Facebook Live video, he states

6    supposedly, you know, "The VP," or, "The vice president is

7    here," and he makes statements, "Fuck the police, fuck the

8    vice president," and states that he could smoke the vice

9    president.

10             Now, that's not the basis for the threat charge in

11   and of itself because he doesn't say I will or I'll shoot the

12   vice president.  He does that later.  But I would also submit

13   that the Facebook video is very telling of his intent.  He

14   claims that he was drunk at the time, but there is absolutely

15   no other evidence of that.  And while voluntary intoxication

16   can be a defense to a specific intent crime like this, it

17   certainly doesn't negate probable cause, and there's no

18   evidence besides his statement that he was drunk.

19             In the Facebook video, he's not stumbling.  He

20   speaks clearly.  He has the wherewithal to film himself.  He's

21   clearly angry at the vice president.  He doesn't have to have

22   plans to assassinate anyone, just knowingly and willfully make

23   the threat and intend that it be viewed as a threat and --

24   objectively and subjectively, even if he doesn't intend to

25   carry it out.

1          Now, the vice president was there, and with that in

2    mind, it gives it context and provides even more insight into

3    his intent, because he was mad, he doesn't like the president,

4    and he was filming himself on Facebook Live, I suppose being

5    the tough guy.

6          The problem is, is that the defendant, by his own

7    admission, smokes marijuana daily, is an alcoholic, and while

8    pretrial services submitted a report that he is eligible to go

9    to treatment for the -- to the treatment facility, pretrial

10   services also recommends against his going to treatment as a

11   risk of nonappearance and danger, and I -- the Government

12   objects to any kind of release.  While he may be in desperate

13   need of treatment and had a recent DUI before this incident

14   and suffered a loss, his personal need to address these issues

15   does not remotely outweigh the danger that he presents to the

16   community.

17         The Government's not submitting that he went to the

18   resort to threaten the vice president or to shoot the vice

19   president.  He's clearly a person -- the defendant is a person

20   who, because of his issues and because of his attitude, these

21   crimes that he commits occur in the moment.  The DUI that he

22   got the week before this incident, he totaled his mother's

23   car.  He admitted to smoking marijuana.  He was charged with

24   extreme DUI and then two other DUI accounts -- counts

25   involving intoxication and marijuana, and he could have killed

1   somebody.  Really more than anything the defendant has been

2   very, very lucky, or at least the community's been lucky at

3   this point.  He -- whether he's on a downward spiral or not,

4   the public's fortunate that things haven't gone differently

5   multiple times.

6          As I mentioned, the drug use, there was cocaine

7   found in the home.  There is some indicia of sale.  But

8   regardless, there's three firearms and body armor found in the

9   residence.  And that's correct, at the time of the search

10  warrant, he was not a prohibited possessor, but it's the

11  combination and the circumstances of all of these things that

12  make for a very dangerous, dangerous situation.  He had a

13  breath test of .175, well over the legal limit.  He could have

14  killed someone in that neighborhood.  It's a lucky day for

15  everyone that he didn't.

16         And then, at La Paloma, the three Army witnesses who

17  saw him wave the gun around after pulling it out of the chest

18  pack that he is clearly wearing around with a huge knife also

19  in the pack that can be seen, the handle can be seen in the

20  Facebook video, these unarmed Army officers, who are trained

21  Army personnel, felt threatened enough to take cover.  Once

22  again, not only the defendant who could have been shot and

23  killed, but also for the general public who's around there,

24  this could have ended up in a shootout had the Secret Service

25  agent not been busy at the vehicle checkpoint.

1            And then, when they went to serve the search

2    warrant, his mother warned him ahead of time that agents were

3    raiding the home.  Luckily once again for everyone he didn't

4    see that text based on the photograph that the agents took and

5    the fact that he was asleep.

6            But once again we have a defendant who's not

7    completely, like, a solid member of society.  He's sleeping on

8    a pillow with a loaded handgun, the one that he admits he

9    waved around at La Paloma.  It's got a bullet in the chamber.

10   I would submit that whether it's because he's paranoid that

11   someone's either out to get him so he's got to sleep on this

12   loaded handgun or he's concerned that the police are going to

13   arrest him, as his mother told him, that could have once again

14   been a very dangerous and deadly situation for all involved,

15   but luckily, once again, that didn't happen.

16           With all of that, in addition to the lack of proper

17   family support or stability, the Government would object to

18   any kind of release, because he -- there's a risk of

19   nonappearance and dangerousness to the community.

20           And with regard to probable cause, the Government

21   has shown well beyond a probable cause showing that the

22   defendant made a threat to shoot, essentially kill the vice

23   president.  There are witnesses to that event, and he waved a

24   gun around, which further shows his intent not only to make

25   the threat, but shows that objectively it was viewed as a

1    threat.

2            So we'd ask -- I would ask that you bind him over

3    for trial and that he remain detained.

4            THE COURT:  Thank you, Ms. Savel.

5            Ms. Savel, is this a case where the Crime Victims'

6    Right Act is implicated, and if so, was there notification to

7    the victim and any statement that the victim would want to

8    make?

9            MS. SAVEL:  Could I have one moment?

10            THE COURT:  Sure.

11            MS. SAVEL:  Your Honor, we have provided victim

12    notification.  It is under the Victims' Rights Act, and

13    essentially the protective division of Secret Service is

14    serving as a victim representative for the vice president, and

15    so with that, Secret Service would also request that the

16    defendant remain detained.

17            THE COURT:  Okay.  Thank you.

18            Mr. Sagar?

19            MR. SAGAR:  Your Honor, I acknowledge that there are

20    concerning facts presented today in the allegations that

21    Mr. Bracamonte was involved in, but I think that there's a

22    couple different facts that I want to point out that I think

23    are important to the Court.  I'll start with just the probable

24    cause issue for the preliminary hearing.

25            In order to -- for the Government to prove that

1   there's a true threat, which is distinguishable from a threat

2   that's not, quote/unquote, a true threat, because the threat

3   statutes have to be interpreted with command of the First

4   Amendment clearly in mind, that's Supreme Court law, that the

5   statement's a true threat if a reasonable speaker would foresee

6   that those to whom he makes the statement would interpret the

7   statement as a serious expression of intent to inflict death

8   or bodily harm on in this case the vice president.

9          So I think the two sections there that I'd like to

10  provide some facts on is whether a reasonable speaker would

11  foresee that the person he made the statement to would

12  interpret the statement as a serious expression and also

13  whether it's a serious expression in this case.

14         And I think in order to do that, it's important to

15  look at the entire factual context.  In fact, that's what the

16  case law says that you have to do.  In the Hanna case, 293

17  F.3d 1080, this is a Ninth Circuit case, states that, whether

18  a defendant's words constitute a true threat under 18 U.S.C.

19  871 must be determined in light of the entire factual context

20  of the defendant's statements.

21         And I acknowledge that there are facts within the

22  entire context that work against Mr. Bracamonte, but some of

23  the factors that I think the Court should consider on the

24  defense side are the overall purpose.  I know -- of him going

25  to La Paloma.

1    I know the Government has stated an argument that

2  they're not saying that he went there with the intent to do

3  this, but I do think it's relevant in looking at the overall

4  context, because many of the cases that I reviewed have to do

5  with individuals sending letters, for example, directly to the

6  individual that they're making a threat to and having kind of

7  more of a directed purpose toward having that threat become

8  known.

9    So this goes, I think, toward -- to the -- whether

10  the reasonable speaker would interpret this to be perceived as

11  a true threat or serious expression of a threat, because what

12  we know is that Mr. Bracamonte goes to La Paloma to hang out

13  with friends.  There's no evidence indicating he was doing

14  anything illegal or dangerous or threatening to anyone while

15  he's at La Paloma.

16    We do know that he was upset he needed to walk this

17  long distance the next day when he's either at least hung over

18  or drunk or some shade in between there.  He gets the bottle

19  of water the next morning after hanging out with his friends

20  the night before at the bar, walks down the driveway, and is

21  leaving the resort.

22    He is not showing any intention of actually -- and I

23  know the Government has enough to prove that he has the -- is

24  actually intending on carrying out the threat, but this

25  matters for whether it's a serious expression of a true -- of

1    a true -- a serious expression of intent to inflict death or

2    bodily harm on the vice president.

3            He's moving in the opposite direction of where the

4    vice president is.  It's not even clear to him if the vice

5    president is definitely there.  He says supposedly the vice

6    president is there.  He states on the video that, if I wanted

7    to, I could smoke the N-word, and then he starts ranting

8    about, you know, the president, the vice president, the police

9    department.

10           He's -- this is what I would consider more of just a

11   general venting or ranting where he's making these statements

12   at the -- in the valet area of the hotel, and then, after

13   stating that, which is very conditional, if I wanted to, he's

14   not stating at that point on the video -- the only evidence

15   that we have that's very clear was seeing what he says on the

16   video.  I'll get to the alleged threat he made later, but if

17   you just took that video itself, I don't think that that would

18   really be actionable or chargeable by the Government, because

19   he's saying, if I wanted to, I could do this or that, and if

20   you look at some of the case law, that wouldn't be -- get

21   anywhere -- anywhere close.

22           In the Lincoln case, which is 403 F.3d 703, the

23   Ninth Circuit case from 2005, this individual, Lincoln, was in

24   prison.  He was in anger management classes, and he's writing

25   in a workbook, stating in a workbook, "One, kill people; two,

kill Bush; three, kill Bush wife; four, kill the FBI."  Then
he wrote, "President, shred his body up into little pieces.
Kill his wife's family."  He wrote he's going to shoot the
president with a .30-06 rifle that would put a hole in the
president three-and-a-half inches wide.

          Then later an agent goes to speak with him about
this, and what he tells the agent is, when he got out of
prison, he was planning to get a group of people together from
Seattle, travel to Washington, D.C., stakeout the White House,
and shoot the president through an open limousine window.

          They didn't charge him at this time, but then later,
taking into account not the workbook, because there was a
privilege issue, so they didn't consider that in context, but
the statement that he makes to the agent together with a
letter that he writes directly to President Bush stating, "You
will die too, George W. Bush, real soon.  They promise that
you would.  Long live bin Laden," all of that taken together,
this is a sufficiency of the evidence case.

          They found that that was insufficient evidence, even
considering the context of him stating -- Lincoln stating to
the agent previously his plan to travel to shoot the president
through an open limousine window.  It sounded very thought
out.  And so I think that that's relevant in terms of the
probable cause issue and will probably be later relevant if
the Court does find probable cause today.

1          In terms of the -- I think what I want to do is talk

2    a little bit about the discrepancies having to do with the

3    alleged threat when he's walking away.  So Agent Rinaldi

4    testified on direct that this statement was made as he's

5    walking by the checkpoint, and I think it will be very

6    different in terms of this gets to reliability of this

7    evidence.

8          Agent Rinaldi was not there.  How do we know for

9    sure that he made the statement, "I'll shoot the vice

10   president?"  This is coming from these three officers that are

11   there.  And I'm not saying -- you know, I don't know anything

12   about their background to try to cast some doubt on their

13   credibility other than some of the facts that were provided,

14   which is that, instead of it being Mr. Bracamonte walking by

15   the checkpoint and he's saying it where they can hear directly

16   what he's saying, all three of them actually told Agent Seat

17   that it was 20 to 25 yards away.

18         So -- and it was said.  It was not yelled out.  So,

19   you know, if you picture standing at, you know, the zero yard

20   line, 20 to 25 yards out on a football field, and someone says

21   something as opposed to yelling it out, I think the Court

22   needs to consider how well we know that that is the specific

23   wording that he used, because it's very important to know the

24   specific wording, because these cases have to be looked at

25   through the lens of First Amendment law and whether it's

1     protected speech.

2            And so, you know, if there's a slight variation of

3     what he's saying there, you know, for example, previously he

4     said, "If I wanted to, I would," I think that that's relevant

5     for the Court to consider, because we don't know for sure the

6     specific wording that was used.  This is what the officer said

7     that they heard, but there's a big distance involved, and it's

8     very different to hear something when someone walks right by

9     you than it is when they're 20 to 25 yards away.

10           The second issue in terms of viewing whether this --

11    these specific words were used and whether this threat was

12    stated in this manner is that there are discrepancies between

13    what the officers saw regarding Mr. Bracamonte.  One of the

14    agents sees him brandish the gun twice, and then two of the

15    agents saw him brandish it once.

16           We know that he was close to the vehicle if we

17    believe the 911 caller, because he was supposedly with this

18    female right near where the vehicle was.  We know from the

19    officers that the vehicle was partially obstructed, that only

20    part of the car could be seen because there's a curb in the

21    road.

22           So, I mean, I don't have in front of me the layout

23    specifically of where he was in relation to the officers who

24    were at the checkpoint, but I think it's relevant for the

25    Court to consider, you know, the distance from Mr. Bracamonte

 1   and what they could specifically see related to the gun.  And

 2   the gun matters because, when you are looking at the entire

 3   factual context, what he was specifically doing with that gun

 4   and when he was doing it in relation to the comments that he

 5   allegedly makes I think are relevant.

 6          So if the car could only partially be seen and

 7   there's a curb in the roadway between the checkpoint and where

 8   the car is, and we know that he's very close to the car, then

 9   I think that there is a question as to how much the officers

10   could see, especially when one of them saw a gun come out

11   twice and two of them saw it come out once.

12          There's also this discrepancy having to do with the

13   female and when she got into the car.  So, you know, the

14   officers had told Agent Seat that the -- that they had -- the

15   female had gotten into the car, and then he walked further

16   down, and then he got into a Lyft car.  What Mr. Bracamonte

17   had told the agents was that there was even two different --

18   one was Uber and one was Lyft, so there are two different

19   cars.  But then we also had evidence that, I believe from

20   Agent Rinaldi's report, when he talked to the officers,

21   showing that they had gotten into the car together.

22          And so I'm pointing these things out because maybe

23   not any one of them is -- clearly shows that we can't place

24   full credibility and reliability on what the officers saw, but

25   I've just pointed out several different reasons why the facts

don't all line up.  And I know they're in the middle of what

they say, seeing a gun waved around, they're taking cover.  I

recognize that.  But we're also left with now deciding whether

there's probable cause to go forward in the case when

statements are made that could be protected by the First

Amendment that are 20 to 25 yards away from where they are,

and there are these discrepancies.

        I think in terms of the probable cause issue, Your

Honor, we know that he's upset he had to walk further down

this roadway.  He made some comments that are concerning and

problematic even on the Facebook video.  But it's a question

of whether this was really a serious expression of an intent

to do harm.  Would he reasonably foresee that others would

interpret that as a serious expression to do harm?

        And I do think, even with -- because -- the defense

position is disputing the characterization of the gun -- the

gun may have been brandished, but how it was waved about and

pointed about, I think that there's enough discrepancies there

where it's not clear enough or reliable enough for the Court

to make an express finding of that, and also with regard to

the statements that are the heart of what the Government's

case is, because of all the factors I've just mentioned.  So

for all those reasons, I would ask the Court to find that

there's no probable cause to go forward in the case.

        With regard to dangerousness, now we're dealing with

 1   the clear and convincing evidence standard where the

 2   Government has to prove by clear and convincing evidence.

 3   Under Black's Law Dictionary, that means that the evidence

 4   indicates that the thing to be proved is highly probable, the

 5   factfinder must be convinced that the intention is highly

 6   probable, and it also -- it's considered to be a,

 7   quote/unquote, high burden that must be demonstrated in fact.

 8           And yes, it's not getting to proof beyond a

 9   reasonable doubt, but it is still a high standard to show that

10   he's, you know, currently a danger to the community.  I think

11   what this was more is, even taking some of these statements

12   as, well, we know at least what he said on the Facebook video,

13   very stupid, off-the-cuff comments that he's making at the

14   time where he happens to be at the place where the vice

15   president is, which makes it more concerning, but there was

16   no, you know, preplanning on his part to be engaged in that

17   sort of conduct.

18           Now, the -- there's been a lot of talk about the

19   firearms and him having the firearms.  I think what is the

20   concerning part would be the allegation of him bringing out

21   the firearm, brandishing it, and then allegedly making these

22   comments, but he is permitted under Arizona law to walk with

23   this concealed firearm.  Agent Rinaldi testified to that.  All

24   these guns that are at his house he's permitted to have.  He's

25   not a prohibited possessor.

1          The gun that's under his pillow, I mean, you know, I

2     really -- I believe that Ms. Savel at one point characterized

3     him as being paranoid, but I think there is a lot of people

4     who feel that their Second Amendment right, you know, allows

5     them to have the protection of a gun nearby.  I unfortunately

6     don't have the evidence -- well, I'm not going to get into

7     some of the reasons why he may have that, that gun there at

8     this juncture.

9          But all I'm trying to point out is that the mere

10    fact of having guns that he's lawfully permitted to have and

11    having a firearm under his pillow does not make him a

12    dangerous person.  There's many individuals who are going to

13    have a firearm as close as possible because in that way it can

14    be protection for someone coming in.

15         I think what would show him to be more dangerous

16    would be his reaction to someone coming into his -- into his

17    room.  He woke up when Agent Rinaldi announced a police

18    presence, and he was cooperative.  He in no way was showing

19    any kind of violence or danger to the authorities.  I believe

20    he even helped them to tell them where the firearms were.  He

21    made no kind of furtive movement or some type of movement to

22    try to grab at a weapon or to fight back against the agents.

23         So I think all of that cooperativeness moves more in

24    his favor towards not -- the Government not proving by clear

25    and convincing evidence that he's a danger.  A lot of the

1   hearing was spent on these pictures of what was found at the

2   house, of the guns being there and the marijuana and the

3   reference to what is believed to be cocaine that's there at

4   the house.

5           I was a little surprised that there was that much

6   focus on that when we have a case that's a threats against the

7   president or vice president.  I was thinking the entire time

8   we're going to be focused on how dangerous this man is because

9   of this credible, real threat he posed to the vice president,

10  and I think it's -- the fact that so much time at the hearing

11  was spent on these lawfully possessed firearms and someone

12  who's a self-professed smoke-all-day-every-day marijuana user

13  who has a head injury, I think it shows some of the weakness

14  in the Government's case as far as how -- how real and

15  dangerous this threat supposedly was.

16          I mean, I don't want to get too much into the

17  overall context, but we are living in a tense time right now

18  where there is a lot of comments made in this politically

19  charged atmosphere.  I don't think what Mr. Bracamonte was

20  doing was part of that whole tense atmosphere.  Instead, he

21  was partying with friends and makes these -- makes certain

22  statements, at least on the Facebook video, that were him, as

23  his mother said, talking out of his ass, just making these

24  general rants.  And I think that goes to show him being less

25  of a danger, that the Court shouldn't view him as a serious

1    danger based on that.

2            He's 32 years old.  I would -- we would expect to

3    see, I think, some indication beyond this DUI case and the

4    drug possession case that he has some serious, you know,

5    background.  There is a misconduct involving weapons case

6    from -- I believe it's from 2012.  I tried to get some

7    information about that.  I think it might have to do with some

8    kind of concealed carry violation at that time.  But I don't

9    think that there's anything in his past to indicate that he's

10   threatened individuals with a weapon before, and by his age,

11   you usually would see some kind of a lead up to that.

12           I think we can probably -- both sides can agree that

13   he's in a period of time right now that -- where he lacks

14   stability.  He's someone who probably does need mental health

15   evaluation and treatment.  He's someone who does need to have

16   drug treatment.

17           You know, Jesus Pina, who I know was not there for

18   the two months leading up to the arrest but has known him

19   since he was a baby, lived with him the past year, does not

20   know him to be someone who's prone to fighting or to acting

21   out violently or to being political in any way.

22           I think that, you know, even in the interview and

23   the statements he makes to Agent Rinaldi, you know, there's a

24   recognition of kind of the stupidity of making any kind of

25   statements during this, in the context of the vice president

1   being at an event.

2          But you know, when you look at all those -- this is

3   combining the two arguments in a way, but again, by leaving

4   the area, making the statements in this kind of off-the-cuff

5   way, shows that he's not someone who is actually going to act

6   out on any kind of threat, even if he made a threat.

7          There was this -- there's been talk about the gang.

8   You know, I don't honestly think that that is -- someone

9   having gang affiliation when he's stating he used to be

10  involved but he's no longer actively involved, and there's no

11  indication that the gangs are -- that some gang affiliation is

12  connected to this alleged threat behavior, I don't think that

13  the gang piece really takes it further into a superdanger

14  category or raises it up to clear and convincing evidence, and

15  I don't think that the drug use does either.

16         I think what I would ask from the Court is for him

17  to be released to CBI, where he's been approved.  There is a

18  bed space available.  I know pretrial services is not

19  recommending release, but I also know that this is not a

20  presumption case, and I think that there are conditions here

21  that would be sufficient in order to assure that he's not

22  presenting a further danger to the community, and I think that

23  those would include mental health evaluation and treatment,

24  and that would also include drug treatment.

25         And so I don't think that the Government's met the

UNITED STATES DISTRICT COURT

1    burden by clear and convincing evidence in this particular

2    case, and for that reason we'd ask for his release, Your

3    Honor.

4            THE COURT:  Thank you.

5            Ms. Savel, anything further?

6            MS. SAVEL:  Just briefly, Your Honor.

7            I just want to be sure to clarify that the defendant

8    has to knowingly and willfully make any threat to take the

9    life of the vice president and intend a serious expression,

10   expression to do harm.  It's not that he has to intend to do

11   harm but to express, seriously express, harm.  And there's a

12   difference.  I mean, a person can make a phone call to the

13   vice president and say, I'll shoot you, and they're not

14   anywhere near the vice president, or, I'm going to shoot you,

15   and that is a true threat.

16           The fact that he's in close proximity and is aware

17   that the vice president is there simply lends itself to show

18   his intent to make the -- to express the threat.  And

19   certainly it's much more than an off-the-cuff statement to

20   say, "Fuck the VP.  I'll shoot that," N-word, "too," and wave

21   a gun around.  It's a serious expression of intent to show

22   that -- to threaten.  It's a serious expression to threaten,

23   and others took it that way as well.

24           Secret Service followed up on it.  They took it

25   seriously.  They certainly didn't say it seems off the cuff

1    and not follow up.  It was viewed by the witnesses as well as

2    Secret Service as a true threat.  And the Facebook video, as I

3    mentioned before, is not the basis for the charge.  It is

4    evidence in support of the charge.  And there are First

5    Amendment considerations, but there's the totality of the

6    circumstances, totality of the evidence, that certainly

7    demonstrates that the defendant knowingly and willfully made

8    this threat to shoot the vice president.

9            And as far as the defense's comment on the focus on

10   pictures, as this is a dangerousness hearing, the Government

11   believes it's very important for the Court to see the

12   residence that the defendant's in, the circumstances that he's

13   living in, the lack of stability there, the danger that he

14   could impose to someone, as someone who smokes weed daily and

15   possesses firearms, keeps a loaded firearm under his pillow.

16           And there is really only so many times the

17   Government's going to ask the witness to repeat what the

18   threat was that was heard by three witnesses, and it's not, I

19   wish someone would shoot the vice president, or, I'm planning

20   to.  It is, "I'll shoot the VP."  And with that, the

21   Government has shown that there is more than enough probable

22   cause that he made a true threat, in violation of 18 U.S.C.

23   871.

24           And drug treatment, from what I've always

25   understood, is not a lockdown facility.  He can just abscond

1 or walk away.  And his behavior both during this offense as

2 well as leading up to this offense demonstrates that he can't

3 be trusted, at minimum, to exercise good judgment, but to have

4 the ability to just leave the treatment facility and in be in

5 a place where he could pose a danger to the community.

6          THE COURT:  Thank you.

7          Mr. Sagar?

8          MR. SAGAR:  Your Honor, just one brief issue.

9          THE COURT:  Sure.

10          MR. SAGAR:  And I know that Mr. Bracamonte does

11 believe that -- feels that he needs the treatment, and he does

12 -- he's willing to abide by the conditions and follow through

13 with that treatment, especially from this experience of being

14 in jail at this point, but the one point, we could probably

15 dispute this all day, but I would say that what the Facebook

16 video shows is, it provides context for the defense position,

17 because what he is stating there is, if I wanted to, I could

18 do this.

19          And so to go from that to, you know, what, 10-15

20 minutes later, maybe, when he's walking down the driveway to

21 now, I'm actually going to carry it out and I will do it, I

22 don't really see what happened in between that would change

23 that and make him actually now be stating a serious expression

24 when he just shortly beforehand is stating that, if he wanted

25 to, he could, and he's basically -- what he's saying there is,

 1    I don't want to, and if I did want to, I could.

 2              Thank you, Your Honor.

 3              THE COURT:  Thank you.

 4              Having taken into consideration all the testimony

 5    today, as well as argument from counsel, with respect to the

 6    preliminary hearing, at this time I do find that the

 7    Government has established probable cause to believe that a

 8    crime has been committed and that Mr. Bracamonte is the

 9    individual that committed that crime.

10              Mr. Sagar, I agree, if it was only the Facebook

11    video, we might be in a difference situation.  The issue that

12    the Court has to look at is the totality of the circumstances.

13    We have the Facebook video, and shortly thereafter, and I do

14    agree it was shortly thereafter, but shortly thereafter we

15    have testimony regarding specific statements of a serious

16    expression to do harm, as indicated by the testimony that's

17    been given here today, and actions along with those statements

18    of brandishing the weapon, and those actions and statements

19    were enough for at least three EOD individuals and two

20    civilians to believe and consider that as a serious expression

21    to do harm, as the Court does as well.

22              So based on the totality of all the evidence today,

23    I do find probable cause to believe that the crime has been

24    committed and that Mr. Bracamonte has committed that crime.

25              Turning now to the detention and dangerousness

1    issue, I've had an opportunity to rereview the original

2    pretrial service report from August 26th and the addendum from

3    September 3rd and also taken into consideration all of the

4    evidence that's been presented to the Court today.

5            I do find that there is clear and convincing

6    evidence at this time to show that Mr. Bracamonte is a danger

7    to the community.  We have the evidence, again, the actions

8    from the date of August 11th.  In addition the information and

9    the items that were taken in the search warrant show the

10   ability.  Although he legally can possess those weapons, the

11   concern the Court has, based on all the information, is we

12   have an individual who is drinking heavily during the course

13   of the last few months, doing drugs, both with marijuana and

14   cocaine, making threats, has a large number of guns in the

15   house that his mother has indicated both to pretrial and at

16   the search warrant that she was unaware of any of these guns,

17   some of them being in plain view, or at least the ammunition

18   being in plain view.

19           Although Mr. Bracamonte was cooperative during the

20   execution of the search warrant, I do know note that the agent

21   indicated that they woke him up.  Of concern to the Court as

22   well is his mother's warning text to him about what was going

23   on.  I know she was indicated as a potential suitable

24   third-party, but based on all of the illegal paraphernalia

25   that is in the house, in plain view, coupled with the amount

of weapons, coupled with what has been going on in

Mr. Bracamonte's life during this really probably two-week

span of time, I don't -- would not find her to be a suitable

third-party custodian.

Of concern also to the Court, and I think which goes

to the dangerousness issue, is the fact that he had a DUI

within I think 10 days of this arrest, or the actions that are

a result of this arrest in which he had a blood alcohol of

.175.  He totaled his -- the car that we thought was his

mother's, but now I think it's Mr. Pina's, but at any rate he

totaled the car.  He hit another vehicle in a residential

area.

That coupled with the brandishing of the weapon and

making statements which the Court at this time does consider

threats, I believe that he is -- there's not only the danger

that he might engage in additional criminal activity, but

there's danger to the detriment of the community.

Based on all the information before the Court, I do

find based on clear and convincing evidence that

Mr. Bracamonte is a danger.

In addition, with respect to risk of nonappearance,

I do find by a preponderance of the evidence that

Mr. Bracamonte does pose a risk of nonappearance.  This is

based on a previous failure to appear, although I do note that

it was from 2009.  However, there's his current use and

 1   history use of marijuana and cocaine abuse, the recent alcohol

 2   abuse, the DUI that was mentioned before, the history of

 3   mental health issues, in addition to a previous misconduct

 4   involving a weapon charge.

 5           At this time I believe that he poses a risk of

 6   nonappearance as well and that there's no conditions that can

 7   be set to either ensure that he would make his court

 8   appearances or ensure the safety of the community.

 9           So at this time, Mr. Bracamonte will be detained and

10   held over pending his trial.

11           Is there anything further, Mr. Sagar, at this time?

12           MR. SAGAR:  No, Your Honor.

13           THE COURT:  Okay.  Ms. Savel, anything?

14           MS. SAVEL:  No, Your Honor, except -- and I'm saying

15   this also to remind myself, we will provide the report of

16   Agent Seat.  We may not be able to provide it until tomorrow,

17   but we'll get it to defense counsel as soon as possible.

18           THE COURT:  Okay.  And certainly, Mr. Sagar, if you

19   do find any information in there where you do believe that

20   this hearing should be reopened, I would ask that you file a

21   motion but also contact my chambers.  This case is actually

22   assigned, officially assigned, to Judge Ferraro, so -- but

23   because I was the one that did the hearing, I should do any

24   continuation of the hearing.  So if you file a motion, just

25   contact my chambers as well so that we know about it.

UNITED STATES DISTRICT COURT

1          MR. SAGAR:  I understand, Your Honor.

2          THE COURT:  Okay.  All right.  Thank you.

3          MR. SAGAR:  Thank you.

4          MS. SAVEL:  Your Honor Thank you.

5          (Proceedings concluded in this matter at 3:25 p.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3          I, Erica R. McQuillen, do hereby certify that the

4   preceding pages of typewritten matter are a true, correct, and

5   complete transcription of the digital recording of proceedings

6   in the above-entitled matter.

7             Dated this 17th day of October, 2020.

8

9                        s/Erica R. McQuillen
                  Erica R. McQuillen, RDR, CRR
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25